UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE BERNSTEIN,

                              Plaintiff,

       -against-

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP, MAX BERGER, STEVEN
SINGER, SALVATORE GRAZIANO, EDWARD
GROSSMANN and GERALD SILK,

                              Defendants.

Case No. 14 Civ.


**<u>COMPLAINT</u>**


**JURY TRIAL DEMANDED**

       Plaintiff Bruce Bernstein ("Bernstein" or "Plaintiff"), by his undersigned attorneys, for

his Complaint against Defendants Bernstein Litowitz Berger & Grossmann LLP ("BLB&G")

and Max Berger, Steven Singer, Salvatore Graziano, Edward Grossmann and Gerald Silk

(collectively, "Individual Defendants" and, with BLB&G, "Defendants") alleges as follows:

## <u>NATURE OF ACTION</u>

       1.       This action arises from Defendants' retaliation against Bruce Bernstein for his

efforts to address and expose Defendants' involvement in an unlawful kickback scheme (the

"Kickback Scheme").

       2.       Through the Kickback Scheme, Defendants secretly assigned tasks to undisclosed

Mississippi lawyers and distributed fees from the proceeds of securities class action settlements

as a *quid quo pro* for being repeatedly selected as counsel for a Mississippi pension fund.

       3.       Defendants intentionally and wrongfully concealed those payments from class

members and the courts.

       4.       As an attorney employed by BLB&G, Bernstein became aware of facts relating to

the Kickback Scheme and brought them to the attention of the Defendants.

5.      After Defendants rebuffed Bernstein's repeated efforts to address these facts internally at BLB&G, Bernstein reported his concerns to the U.S. Attorney's Office.

6.      Defendants retaliated by terminating Bernstein's employment.

7.      Defendants also caused a lead plaintiff in another securities class action, a client who followed Bernstein to BLB&G, to end his professional relationship of nine years with Bernstein.

8.      In this action, Bernstein seeks to recover the compensation he would have earned if Defendants had not wrongfully terminated him, the fees he would have received had Defendants not tortiously interfered with his relationship with his client of nine years, and related relief.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

10.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Bernstein's related claims arising under state law.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Bernstein's claims occurred in this district.

## THE PARTIES

12.     Plaintiff Bernstein is an individual residing in New York State.  Bernstein has practiced law since 1997 and is a member in good standing of the bar of the State of New York.

2

Bernstein was employed by BLB&G[1] as an "of counsel" attorney from December 15, 2008 through October 25, 2012.

13.     Defendant BLB&G is a limited liability partnership organized under the laws of New York State.  BLB&G maintains its principal place of business in New York City and operates offices in California, Illinois and Louisiana.

14.     Defendant Max Berger ("Berger") is a founding partner of BLB&G.  During the period of Bernstein's employment at BLB&G and the two weeks immediately following his departure from BLB&G (the "Relevant Period"), Berger participated in the operation and management of BLB&G.

15.     Defendant Steven Singer ("Singer") is a former partner of BLB&G.  During the Relevant Period, Singer participated in the operation and management of BLB&G.  Upon information and belief, in March 2014, Defendant Singer left BLB&G.

16.     Defendant Salvatore Graziano ("Graziano") is a partner of BLB&G.  During the Relevant Period, Graziano participated in the operation and management of BLB&G.

17.     Defendant Edward Grossmann ("Grossmann") is a founding partner of BLB&G. During the Relevant Period, Grossmann participated in the operation and management of BLB&G.

18.     Defendant Gerald Silk ("Silk") is a partner of BLB&G.  During the Relevant Period, Silk participated in the operation and management of BLB&G.

---

[1]     Bruce Bernstein has no relation to the late Paul M. Bernstein, one of the founders and name partners of BLB&G.

## FACTS COMMON TO ALL CLAIMS

### A.    Bernstein Joins Milberg and Plays a Key Role in the Merck Litigation

19.     In May 1999, Bernstein accepted a position as an associate at Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg"), where he became a partner in 2006.

20.     While at Milberg, Bernstein worked on *In re Merck & Co. Inc. Securities, Derivative and ERISA Litigation*, a large securities class action that was filed in November 2003 and is currently pending in the U.S. District Court for the District of New Jersey (the "Merck Litigation").

21.     Through his work on the Merck Litigation, Bernstein established a professional relationship with Richard Reynolds ("Reynolds"), who was appointed as one of four lead plaintiffs in the case.

22.     In June 2006, Bernstein resigned from Milberg in response to the indictment of the firm.

### B.    Reynolds Follows Bernstein to Dreier

23.     Following his departure from Milberg in June 2006, Bernstein accepted employment as a partner at Dreier LLP ("Dreier").

24.     Reynolds followed Bernstein to Dreier, where Bernstein continued to represent him as a lead plaintiff in the Merck Litigation.

25.     In January 2007, in connection with the Merck Litigation, Reynolds averred that "[d]uring my numerous interactions with Bruce Bernstein over the last three years, while he was at Milberg, and more recently at Dreier, he has earned my full trust and confidence in his ability to effectively prosecute the Action."  (Merck Litigation, Dkt. No**.** 183-3, at ¶4.)

C.      **Reynolds Follows Bernstein to BLB&G**

26.     Following his resignation from Dreier in 2008, Bernstein accepted a position as an "of counsel" attorney at BLB&G.

27.     Bernstein joined BLB&G with the understanding, consistent with industry customs and practices, that BLB&G would pay Bernstein, in addition to his regular salary and bonus, at least 10 percent of the fees generated from the clients he brought in.

28.     Reynolds followed Bernstein to BLB&G, despite BLB&G's prior effort to replace Reynolds and the other lead plaintiffs in the Merck Litigation with the firm's client, the Mississippi Public Employees' Retirement System ("MPERS").  Specifically, in late 2006, when Bernstein was representing Reynolds at Dreier, BLB&G filed a motion to intervene in the Merck Litigation on behalf of MPERS and argued that MPERS should replace Reynolds because he purportedly provided "inadequate representation" and lacked "honesty and candor" in his communications with the court.

29.     Although BLB&G succeeded in adding MPERS as an additional lead plaintiff (and itself as an additional co-lead counsel firm), the court rejected BLB&G's attack on Reynolds's "honesty and candor" and Reynolds remained a lead plaintiff in the Merck Litigation.

30.     Notwithstanding the fact that BLB&G had previously impugned his character in a publicly-filed legal document, when Bernstein joined BLB&G, Reynolds followed him.

31.     Throughout Bernstein's tenure at BLB&G, he remained the primary contact with Reynolds, whom Defendants referred to as "Bruce's client" in the Merck Litigation.

D.     **The Satyam Litigation**

32.     While at BLB&G, Bernstein worked on another securities class action, *In re Satyam Computer Services Securities Litigation* (the "Satyam Litigation"), which was commenced in the U.S. District Court for the Southern District of New York in January 2009.

33.     In May 2009, the court overseeing the Satyam Litigation appointed MPERS as one of four lead plaintiffs and approved its selection of BLB&G and a second law firm, Grant & Eisenhofer LLP ("G&E"), as two of the four lead firms.  Prior to doing so, the court asked Defendant Silk about the request to approve two law firms for MPERS:  "Can you explain to me . . . why I need two firms?"  (Satyam Litigation, Dkt. No. 12.)   Based in part on Defendant Silk's representation that there would be "no duplication of effort," the court approved both BLB&G and G&E as co-lead counsel.  (*Id.*)

34.     Shortly after Bernstein was assigned to the Satyam Litigation in September 2010, on or about September 23, 2010, he met with Defendant Singer and an associate attorney who had worked on the Satyam Litigation but was leaving BLB&G.  Singer informed Bernstein that a solo practitioner from Jackson, Mississippi – Vaterria Martin ("Martin") – would occasionally check on the status of the case for MPERS, even though BLB&G was already providing this information directly to the Office of the Mississippi Attorney General (the "Mississippi AG's Office"), which acts as MPERS' legal advisor and selects and monitors outside counsel on behalf of MPERS.

6

35.     In addition to the Merck and Satyam Litigations, between 2005 and Bernstein's departure from BLB&G in October 2012, BLB&G served as lead or co-lead counsel in at least 14 other shareholder actions in which MPERS was appointed as a lead plaintiff.[2]

36.     Shortly after the September 23 meeting, the departing associate forwarded to Bernstein an email he had sent to Martin notifying her that he was leaving BLB&G.   In his cover email to Bernstein, the departing associate noted, "[t]his is the woman who is 'local counsel' of some sort to MPERS.  She will occasionally check for updates . . . ."

37.     In December 2010, lead plaintiffs in the Satyam Litigation reached an agreement in principle to settle with the company defendant for $125 million.  On February 16, 2011, the parties executed a stipulation setting forth the terms of the settlement.

38.     On February 21, 2011, Martin provided Bernstein and Singer with her timesheets. Although she had not produced any written work as of that date, Martin's timesheets indicated she had spent approximately 50 hours on various tasks.

---

[2]     The shareholder actions in which MPERS was appointed as a lead plaintiff and BLB&G served as lead or co-lead counsel include:  (1) *In re Merck & Co., Inc. Securities Litig.*, 05-cv-2367; (2) *In re Satyam Computer Systems Ltd. Securities Litig.*, 09-md-2027; (3) *In re Converium Holding AG Sec. Litig.*, 04-cv-7897 (S.D.N.Y.); (4) *In re Delphi Corp. Securities Litig.*, 05-md-1725 (E.D. Mich.); (5) *In re Mills Corp., Securities Litig.*, 06-cv-0077 (E.D. Va.); (6) *UnitedHealth Group, Inc. Shareholder Derivative Litig.*, 06-cv-1216 (D. Minn.); (7) *Merrill Lynch Mortgage Pass-Through Litig.*, 08-cv-10841 (S.D.N.Y.); (8) *In re Maxim Integrated Products, Inc. Sec. Litig.*, 08-cv-0832 (N.D. Cal.); (9) *In re Ambac, Financial Group Inc., Sec. Litig.*, 08-cv-0411 (S.D.N.Y.); (10) *Bear Stearns Mortgage Pass-Through Litig.*, *08-cv-8093* (S.D.N.Y.); (11) *In re Merck & Co., Inc. Vytorin/Zetia Securities Litig.*, 08-2177 (D.N.J.); (12) *Goldman Sachs Mortgage Pass Through Litig.*, 09-cv-1110 (S.D.N.Y.); (13) *State Street Corp. Securities Litig.*, 09-12146 (D. Mass.); (14) *Morgan Stanley  Mortgage Pass-Through Certificate Litig.*, 09-cv-2137 (S.D.N.Y.); (15) *Bach v. Amedisys Inc.*, 10-cv-0395. (M.D. La.); and (16) *In re J.P. Morgan Mortgage Pass-Through Litig.*, 12-cv-3852 (E.D.N.Y.).  Of these 16 actions, several, including the Merck Litigation, are still active.

39.     On March 1, 2011, Bernstein received a call at home from Berger, who asked that he join him in calling Martin.  During the call, Berger assigned two unnecessary legal research projects to Martin, including the preparation of an unnecessary legal memorandum.

40.     On or about March 8, 2011, lead plaintiffs reached an agreement in principle to settle with the auditor defendants in the Satyam Litigation for $25.5 million.

41.     On or about March 15, 2011, Bernstein asked if he or Singer was going to instruct Martin to cease performing unnecessary work.

42.     In response, Defendant Singer exclaimed, "What are you, a [expletive] idiot?  That is the dumbest question I have ever heard.  Come on, you were a partner at Milberg.  Are you an idiot?  Do you ever want us to work with George [Neville][3] again?  Do you ever want us to work with Mississippi again?  I hope that your second question isn't as dumb as the first one."

43.     Bernstein disagreed that Martin should continue to perform unnecessary work and was distressed by Singer's response.  Following the exchange with Singer, Bernstein communicated his distress to colleagues at BLB&G.

44.     On the evening of April 26, 2011 – more than six weeks after lead plaintiffs had settled with the auditor defendants in the Satyam Litigation – Martin sent an 18-page legal research memorandum (the "Martin Memo") to Berger, Singer and Bernstein.  The email also attached an updated timesheet in which Martin reported working a total of 207 hours on the Satyam Litigation.  According to the timesheet, Martin had spent the majority of that time researching and drafting the Martin Memo.

---

[3]     George Neville is a Special Assistant Attorney General and is purportedly tasked with overseeing outside class action counsel for the Mississippi AG's Office on behalf of MPERS.

45.     On April 27, 2011, Berger asked Singer and Bernstein to "let me know if [the Martin] [M]emo is decent, just for the record. . . . just in case George [Neville] asks."  The email directed Bernstein to "please hold on to [Martin's] time and make sure she gets all pleadings and drafts on a timely basis."

46.     Bernstein informed Berger that the Martin Memo, which addressed the wrong pleading and contained no meaningful legal analysis, had no value.  Berger agreed.

47.     On May 3, 2011, Bernstein drafted a two-page memorandum to the file, with copies to Berger and Singer, which memorialized Bernstein and Berger's prior discussion that the Martin Memo had no value.

48.     Later that day, Singer commented "good memo" about Bernstein's memorandum to the file and said he thought the Martin Memo was "ridiculous."

**E.**      **Martin Receives $225,000 from the Settlement Fund**

49.     In July and August 2011, Bernstein worked on submissions relating to the settlements and the application for attorney fees and expenses in the Satyam Litigation (the "Settlement and Fee Submissions").  Singer oversaw the preparation and filing of these materials.

50.     The Settlement and Fee Submissions provided information about the four co-lead counsel firms and two additional law firms that served as counsel for the sub-class.  These materials did not identify or refer to Martin or indicate that any fees would be paid to her in the Satyam Litigation.

51.     Martin did not file a *pro hac vice* application or a notice of appearance in the Satyam Litigation, and was not referenced in any document that was filed with the court in that case.  Upon information and belief, Martin was not licensed to practice law in New York.

52.     On September 13, 2011, the court entered judgments approving the $150.5 million combined settlements with the company and auditor defendants.  The court also approved counsel's fee request for 17 percent of the $150.5 million settlement amount, which totaled $25.585 million.

53.     On or about November 17, 2011, Bernstein sought confirmation from BLB&G's comptroller that the firm had not paid Martin.  Bernstein learned from the comptroller that BLB&G and G&E had each paid Martin $112,500, for a total payment of $225,000, from the class settlement proceeds.

54.     BLB&G sent both checks to Martin in Mississippi by Federal Express.  The payments to Martin were the subject of emails between, among others, Singer and Martin.  One such email chain, which Singer forwarded to Grossmann on October 6, 2011, bears handwritten notes referencing the BLB&G general ledger account from which the BLB&G payment was made, referring to Martin as "Satyam Outside Counsel" and stating that Martin was entitled to "75% of $150,000 when settlement is final," and "Pay 10/17. $112,500 – Today."

55.     Shortly thereafter, Bernstein retained counsel, at his own expense, to advise him concerning his ethical and legal obligations in connection with the payments to Martin for unnecessary work in the Satyam Litigation.

56.     Bernstein subsequently learned that Martin – a solo practitioner who had been admitted to the Mississippi bar approximately five years before the filing of the Satyam Litigation – had no securities litigation experience prior to the Satyam Litigation and was married to a Special Assistant Attorney General in the Mississippi AG's Office.  Upon information and belief, Martin's husband had worked directly with the Mississippi Attorney General.

**F.**   **Bernstein Internally Reports His Concerns Over the Newly Discovered Facts**

57.   On November 22, 2011, Bernstein told Graziano about his previous discussions with Defendants Berger and Singer about Martin, his subsequent discovery of the payments to Martin, and additional facts about her professional experience and ties to the Mississippi AG's Office.  Graziano responded that the facts were "concerning."  Later that day, Graziano told Bernstein that he had done "the right thing."  Graziano said that he would discuss the matter with Berger and other senior lawyers at BLB&G.

58.   Later that evening, Graziano asked Bernstein if he thought the fees paid to Martin should have been disclosed to the court.  Bernstein responded, "Absolutely."  Graziano replied, "Yeah, I do too."

59.    Graziano said he had spoken to both Grossmann and Berger about the matter.  According to Graziano, Berger was committed to investigating the matter and might engage an outside firm to do so.  Graziano again told Bernstein he had done "the right thing" and said "everyone knows you're doing it for the right reason."

60.   On November 29, 2011, Graziano told Bernstein that there were "five or six firms" in the Satyam Litigation, including Martin's, to which undisclosed fees had been paid.  Graziano explained that there was "local pressure on the Mississippi AG" to use "local firms" in the Satyam Litigation and other matters.  Graziano stated that BLB&G had done this in multiple cases and reiterated that "it is important for the Mississippi AG to have local Mississippi firms" in these cases.

**G.**     **Defendants Dismiss Bernstein's Concerns and Attempt to Intimidate Him**

61.     On December 5, 2011, Berger summoned Bernstein to his office to "get this over with."

62.     When Bernstein arrived, Grossmann and Graziano were also sitting in Berger's office. Berger said he was upset that Bernstein had spoken to BLB&G's comptroller about Martin. Berger explained that a former BLB&G partner had once come to Berger with a concern regarding an ethical issue at the firm. Berger said, "if you do not feel comfortable with or trust the firm, the relationship with the firm will not work."

63.     Berger defended the payments to Martin by saying that co-counsel often performed "shoddy work." Berger said that the Mississippi AG was under pressure to use "minority firms."

64.     Noting that he "probably would have used different words," Berger said he "agree[d] with the sentiment" that Singer had expressed to Bernstein in March 2011 concerning the importance of allowing Martin to continue performing unnecessary work even after plaintiffs had already reached settlements with the company and auditor defendants.

65.     Berger asked Bernstein if he expected BLB&G to not pay Martin. Bernstein responded that because the Martin Memo did not provide a benefit to the class – an assessment Berger and Singer agreed with – Bernstein did not think Martin would be paid.

66.     Berger asked Bernstein if he felt "comfortable" about the matter. Bernstein said he wanted to think things over.

67.     On December 6, 2011, Graziano called Bernstein and acknowledged that "things got a little rough" during the previous day's meeting, which "wasn't our intention."

68.     At Bernstein's request, Bernstein and Berger met again in Berger's office on December 9, 2011.  Bernstein said he would be more comfortable if the firm consulted with an attorney who specialized in legal ethics.  He pointed out that BLB&G had previously consulted with outside ethics counsel, Professor Bruce Green, on other matters.

69.     Berger claimed not to understand Bernstein's request.  When Bernstein repeated it, Berger responded, "Listen, I think you need to drop this."

70.     Berger explained that, although he believed Bernstein's concerns were "one hundred percent heartfelt," he believed there was a "disconnect" because he and the other Individual Defendants did not believe there was a problem.

71.     Berger told Bernstein to "put the matter behind you" and that "it will not be held against you."

72.     Upon information and belief, during the Relevant Period, no one at BLB&G ever consulted with ethics counsel concerning Martin's role in the Satyam Litigation, her corresponding compensation or the need to disclose this information to the court.

73.     At a BLB&G event on or about the evening of December 15, 2011, Berger and Bernstein spoke for the first time since their December 9 meeting.  Berger approached Bernstein and asked him if he knew an individual whose name Bernstein did not recognize.  Berger responded: "Oh, you don't know him?  Well, he was a whistleblower who had to rent space from us because he was blackballed from the finance industry."

74.     Berger's comment was a veiled but clear threat to "blackball" Bernstein if he reported the facts surrounding Martin to anyone outside of BLB&G.

75.     On December 21, 2011, accompanied by counsel, Bernstein reported the Kickback Scheme to the U.S. Attorney's Office for the Southern District of New York.

**H.      Bernstein Discovers the Kickback Scheme Extends to the Merck Litigation**

76.      In November 2011, Bernstein shared his concerns about the Kickback Scheme with a BLB&G associate, who said he had similar concerns relating to the Merck Litigation.

77.      Upon information and belief, George Neville, the Mississippi Special Assistant Attorney General who oversaw outside counsel for MPERS, had asked Graziano to assign work on the Merck Litigation to a friend of Neville's father.

78.      Graziano told the BLB&G associate that they should speak with Neville about the matter by telephone rather than through email.

79.      The BLB&G associate told Bernstein that these facts made him uncomfortable and that he was reluctant to raise them with senior partners.

80.      Subsequently, Bernstein confirmed that BLB&G was allocating work to small Mississippi firms in the Merck Litigation.

81.      In February 2012, Bernstein learned from a BLB&G paralegal that BLB&G had assigned a document review project to a Mississippi lawyer who practiced in the areas of bankruptcy, personal injury and workers compensation but who had no apparent prior experience handling securities class actions.

82.      In April 2012, Bernstein learned that BLB&G had assigned work on the same document review project to a lawyer at another Mississippi law firm who similarly did not appear to have experience in handling securities class actions.

83.      Shortly thereafter, Bernstein spoke with Graziano about BLB&G's assignment of work to undisclosed Mississippi lawyers in the Merck Litigation.  Graziano said, "I guess Mississippi likes to have local counsel."

14

84.     Unlike the teams of other lawyers reviewing documents for plaintiffs who worked under the close supervision and out of the offices of BLB&G or other co-lead counsel in the Merck Litigation, the Mississippi lawyers reviewed the documents remotely at their offices in Mississippi.

85.     In August 2012, BLB&G assigned new work to these Mississippi attorneys.

86.     The Mississippi lawyers did not file notices of appearance and were not otherwise disclosed in the Merck Litigation.  Upon information and belief, they are not admitted to practice law in the U.S. District Court for the District of New Jersey.

87.     Upon information and belief, neither the individual lead plaintiffs nor the class was informed of the engagement of the Mississippi firms.

88.     On October 1, 2012, Bernstein contacted a former BLB&G partner who, according to Berger, had raised ethical concerns while employed at BLB&G.  The former partner said that he had left BLB&G because the firm had pressured him to make political contributions to elected officials who controlled the selection of counsel in securities cases on behalf of pension funds.

**I.     Defendants' Retaliation Against Bernstein**

89.     On or about October 9, 2012, Bernstein overheard Graziano, Singer and Silk referring multiple times to "Bruce's client" in a meeting in Defendant Silk's office, which was next to Bernstein's office.

90.     Following that meeting, Reynolds stopped responding to Bernstein's emails and phone calls and the Defendants added another partner to the Merck Litigation team.

91.     Bernstein also learned that the Defendants were monitoring his emails.  On two occasions, Bernstein observed his emails on the computer screens of BLB&G's IT professionals.  In both instances, the IT professionals quickly "minimized" the email on their computer screen.

92.     Upon information and belief, Defendants discovered that Bernstein had reported the Kickback Scheme to the U.S. Attorney's Office.

93.     On October 23, 2012, Bernstein overheard several other discussions among members of BLB&G's management committee in Silk's office.

94.     During one such conversation, Bernstein heard his name mentioned and then heard Graziano exclaim, "fire him, fire him" and "put it on the client."  Silk asked "What's our strategy?"  Grossmann responded that "[t]he best strategy is to have him resign, and if not, fire him."

95.     Recognizing that his termination was inevitable, on October 25, 2012, Bernstein sent an email to Defendant Berger attaching a letter that stated:

> Please accept this letter as my resignation from the Firm, with two weeks notice to conduct any appropriate task that may be necessary to ensure a smooth transition.   I previously informed you on several occasions about concerns that I have, and the basis for those concerns, as to the Firm's non-disclosure of fees paid in the *Satyam* action and the role of non-lead counsel not identified to the court.  As a result, I asked that the Firm confer with Bruce Green or another respected ethicist on these matters.  Regrettably, my request was denied.  Although I have made a good faith effort to move forward since our last discussion on the matter, my discomfort has not dissipated.

96.     Approximately two hours after Bernstein sent his letter, Berger responded by email, with a copy to all BLB&G partners, as follows: "with sadness and clearly out of desperation you have found it necessary to dredge up knowingly baseless charges to mask your poor performance at the firm.  Your employment is hereby terminated immediately."

**J.**      **Defendants Interfere with Bernstein's Relationship with Reynolds**

97.      On the morning of October 26, 2012, Bernstein proposed on a call with Graziano that he and Graziano jointly inform Reynolds of Bernstein's departure.

98.      In response, Graziano said that he had already spoken to Reynolds, "sometime between 8:30 and 9:30" that morning, and told Bernstein that Reynolds had decided to remain with BLB&G.

99.      Later that morning, Graziano left Bernstein a voicemail stating that Bernstein should call him to discuss an opportunity in the Merck Litigation that would make Bernstein "happy."

100.      Several times that day, Graziano improperly directed Bernstein, both over the phone and in e-mails, to cease all contact with Reynolds and falsely warned Bernstein that it would be a "violation of the ethical rules" for Bernstein to communicate with Reynolds.

101.      On October 29, 2012, Bernstein informed Reynolds that he had left BLB&G. Reynolds told Bernstein that he had not decided on counsel going forward.  Bernstein told Reynolds that he expected to join a different law firm.  Reynolds asked Bernstein to keep him informed.

**K.**      **Defendants Make Additional Threats and Attempt to Buy Bernstein's Silence**

102.      On or about October 29, 2012, Grossmann acknowledged that Bernstein had brought Reynolds to BLB&G and said that BLB&G would compensate Bernstein if the Merck Litigation settled.

103.      Shortly thereafter, Graziano told Bernstein that "people are very upset" about his "resignation" and threatened that there could be "issues" for Bernstein.  Graziano suggested they

could "come to some arrangement" to compensate Bernstein for his work on the Merck
Litigation and that he did not want things to get "messy."

104.    Graziano warned that if Bernstein spoke to Reynolds or anyone else about the
issues raised in his October 25, 2012 letter to Berger, BLB&G would have to "respond."
Specifically, Graziano indicated that the firm would not compensate Bernstein for his efforts in
the Merck Litigation and would make it "very difficult" for Bernstein to continue practicing law
at another law firm.

105.    Graziano again told Bernstein that Reynolds had decided to remain with BLB&G
and again directed Bernstein not to contact Reynolds.

106.    On November 6, 2012, Reynolds informed Bernstein of his decision to stay with
BLB&G and directed Bernstein not to "solicit" him.

107.    On November 7, 2012, at Graziano's urging, Bernstein met with Grossmann in
person.  Ironically, Grossmann handed Bernstein a letter from Professor Green, BLB&G's
outside ethics counsel.  The letter stated, in pertinent part, "[n]ow that Mr. Reynolds has made
known to Bernstein a desire not to be solicited by Bernstein, further solicitations are forbidden
by the [ethical] rules."  The letter did not, however, mention Defendants' prior communications
with Bernstein directing him not to contact Reynolds and warning him about the adverse
consequences of doing so; nor did it mention any of the issues Bernstein had raised with BLB&G
concerning the Kickback Scheme, Defendants' failure to address those facts and the
circumstances of Bernstein's departure from BLB&G.

108.    Grossmann told Bernstein that BLB&G would serve as a reference for future
employment and acknowledged Bernstein's contribution to the Merck Litigation by, among other

things, bringing Reynolds to BLB&G.  Grossmann stated that, consistent with BLB&G's own practices, BLB&G planned to compensate Bernstein if the matter were resolved successfully.

109.    Grossmann continued that the compensation would be subject to "two caveats." First, Grossmann explained, Bernstein could not attempt to "solicit" Reynolds.

110.    Second, Grossmann stated that Bernstein could not discuss their "disagreement" concerning Mississippi counsel with anyone outside of BLB&G, including Reynolds. Grossmann warned that if Bernstein informed "anyone" about the "disagreement," there was a "90 percent chance that we'll find out."

111.    Bernstein did not respond to Grossmann's proposal.

112.    Subsequently, George Neville sent two letters to Bernstein's home address, purportedly on behalf of the Mississippi Attorney General and MPERS, which stated that BLB&G's engagement of Martin in the Satyam Litigation was confidential and directed Bernstein not to disclose information relating to BLB&G's engagement of Martin.

113.    The second of Neville's letters specifically warned Bernstein that, if he failed to comply with Neville's instruction, "we will have no . . . choice but to hold you . . . accountable."

**L.    Bernstein Is Unable to Find Employment**

114.    Since his departure from BLB&G on October 25, 2012, Bernstein has searched for employment without success.

115.    Bernstein met with two law firms concerning potential employment.  However, when Bernstein informed the law firms that he had been directed to cease communications with Reynolds, the firms lost interest.

116.    Bernstein has continued to search for employment without success.

**M.      Another Court Expresses Concern Over BLB&G's
Retention Practices Involving Public Pension Funds**

117.    On April 5, 2013, a hearing was held concerning attorney's fees in another case in which BLB&G was involved as co-lead counsel, *Bank of Americas Securities Litigation, No.* 09-MD-2058 (S.D.N.Y) (PKC).   BLB&G represented two Ohio-based public pension funds, which the court appointed as two of the lead plaintiffs.   As in the Satyam Litigation, Defendants Berger and Singer were the two lead partners on the case for BLB&G.

118.    During the hearing, the court asked Defendant Berger about a fee application for a non-lead counsel law firm based in Ohio.   The court raised concerns similar to those Bernstein had expressed to Defendants.

119.    Specifically, the court inquired:   "Is this kind of like the way it works out here, that if you want to retain securities counsel to prosecute this case, you make sure you have the AG's designated local lawyer in for a piece of the action?"

120.    Berger assured the court that the failure of the Ohio law firm to file a notice of appearance was inadvertent.   Berger explained, "I hope your Honor understands there was never an attempt by any of the co-lead counsel in this case to in any way pull the wool over your Honor's eyes.   I did not know that the firm, or at least I wasn't aware, because of course the case has been pending for three [ ] and a half years that there was no notice of appearance filed."

121.    Upon information and belief, Defendant Berger's statement was false.

122.    In support of a motion to reconsider the fee issue, a lawyer from the Ohio law firm stated, in contrast to Berger's representation to the court, that co-lead counsel had specifically advised him that filing a notice of appearance and seeking admission *pro hac vice* "was not necessary."

**FIRST CLAIM FOR RELIEF**
**SUBSTANTIVE VIOLATION OF RACKETEER INFLUENCED**
**CORRUPT ORGANIZATION ACT (18 USC §§ 1962(c), 1964(c))**
(Against the Individual Defendants)

123.    Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

124.    During the Relevant Period, BLB&G was a legal entity, a limited liability company, which was directly engaged in interstate commerce by providing legal services in various states throughout the United States.

125.    During the Relevant Period, the Individual Defendants managed the affairs of and controlled BLB&G.

126.    During the Relevant Period and beyond, the Individual Defendants conducted or participated in the conduct of the affairs of BLB&G through a pattern of racketeering activity, including without limitation:

   a.    On or about March 1, 2011, in furtherance of the Kickback Scheme, Defendant Berger used the telephone to assign to Martin two legal research projects Martin was unqualified to perform, in violation of 18 USC §§ 1343 and 1346;

   b.    On or about August 1, 2011, in furtherance of the Kickback Scheme, the Individual Defendants caused the Settlement and Fee Submissions, which intentionally omitted any reference to Martin, to be filed electronically with the U.S. District Court, in violation of 18 USC §§ 1343, 1346 and 1512(b);

   c.    On or about September 1, 2011, in furtherance of the Kickback Scheme, the Individual Defendants caused the Settlement and Fee Submissions, which

21

intentionally omitted any reference to Martin, to be filed electronically with the U.S. District Court, in violation of 18 USC §§ 1343, 1346 and 1512(b);

d.   On or about September 30, 2011, in furtherance of the Kickback Scheme, Defendant Singer exchanged emails with Martin concerning the arrangement of Martin's payment in violation of 18 USC §§ 1343 and 1346;

e.   On or about October 17, 2011, in furtherance of the Kickback Scheme, the Individual Defendants caused payments of $225,000 to be sent by mail to Martin, in violation of 18 USC §§ 1341 and 1346;

f.   Upon information and belief, in or about November 2011, in furtherance of the Kickback Scheme, Defendant Graziano used a telephone to call George Neville of the Mississippi AG's Office to effect the hiring of a friend of Neville's father to work on the Merck Litigation, in violation of 18 USC §§ 1343 and 1346;

g.   In November and December 2011, Defendants conducted a sham investigation and directed Bernstein to "put behind" and "drop" his substantial questions over the role of and payments to Martin in the Satyam Litigation to corruptly persuade Bernstein to refrain from reporting the Kickback Scheme to the court or federal law enforcement, in violation of 18 USC 1512(b);

h.   On or about December 15, 2011, Defendant Berger threatened Bernstein by recounting a story about a "whistleblower" who was "blackballed" from the finance industry to corruptly persuade Bernstein to refrain from reporting the Kickback Scheme to the court or federal law enforcement, in violation of 18 USC 1512(b);

i.   In February, April and August 2012, in furtherance of the Kickback Scheme, the Individual Defendants used emails to assign work in the Merck Litigation to Mississippi lawyers who did not have securities litigation class action experience and who, upon information and belief, were not admitted to practice in the U.S. District Court for the District of New Jersey, in violation of 18 USC §§ 1343 and 1346;

j.   In April 2012, Defendant Graziano rebuffed Bernstein's inquiry about the assignment of work to Mississippi lawyers in the Merck Litigation to corruptly persuade Bernstein to refrain from reporting the Kickback Scheme to the court or federal law enforcement, in violation of 18 USC 1512(b);

k.   In October 2012, after learning that Bernstein reported the Kickback Scheme to the U.S. Attorney's Office, the Individual Defendants retaliated against him and interfered with his employment by devising a plan to interfere with Bernstein's relationship with Reynolds, his client of nine years, in violation of 18 USC § 1513(e);

l.   In October 2012, after learning that Bernstein reported the Kickback Scheme to the U.S. Attorney's Office, the Individual Defendants retaliated against him by devising a strategy to terminate Bernstein's employment and by constructively and actually terminating him on October 25, 2012, in violation of 18 USC § 1513(e);

m.   On or about October 26, 2012, after learning that Bernstein reported the Kickback Scheme to the U.S. Attorney's Office, the Individual Defendants retaliated against him by wrongfully directing him not to contact Reynolds

and falsely informing him that he was forbidden from doing so by the rules of

ethics, causing him to lose Reynolds as a client, in violation of 18 USC §

1513(e);

n.   On or about October 29, 2012, Defendant Graziano threatened Bernstein that,

if he disclosed the Kickback Scheme to anyone outside of BLB&G, things

would get "messy" and the Individual Defendants would make it "very

difficult" for Bernstein to continue practicing law at another law firm, in

violation of 18 USC §§ 1503 and 1512(b);

o.   On or about November 7, 2012, Defendant Grossmann indicated that the

Defendants would compensate Bernstein for his role in the Merck Litigation if

he agreed to remain silent about the Kickback Scheme and warned Bernstein

that Defendants would know if he disclosed the Kickback Scheme to anyone

outside of BLB&G, in violation of 18 USC §§ 1503 and 1512(b);

127.   The Individual Defendants committed the above-referenced acts of racketeering

in furtherance of their ongoing Kickback Scheme.

128.   Upon information and belief, the Kickback Scheme has extended over a

substantial period of time, since before the Relevant Period.

129.   The Individual Defendants' racketeering activity poses a threat of continued

criminal activity by virtue of their multiple representations of MPERS and other pension funds in

class action lawsuits over a period of many years.  The Kickback Scheme poses a specific threat

of repetition and involves the use of racketeering activity as a regular way of conducting an

ongoing legitimate business.

130.     Bernstein was directly injured by the Individual Defendants' retaliation against him for his disclosure of the Kickback Scheme in that the Individual Defendants caused Bernstein to lose his job and his client of nine years.

131.     Accordingly, the Individual Defendants are jointly and severally liable to Bernstein for treble damages, together with all costs for this action, plus reasonable attorney's fees as provided by 18 U.S.C. § 1964.

**SECOND CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE RACKETEER INFLUENCED**
**CORRUPT ORGANIZATION ACT (18 USC §§ 1962(c), 1964(d))**
**(Against All Defendants)**

132.     Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

133.     Throughout the Relevant Period, the Individual Defendants agreed to participate in the affairs of BLB&G through a pattern of racketeering activity.

134.     Throughout the Relevant Period, each of the Defendants knowingly and willfully conspired to further the goals of the Kickback Scheme.

135.     In furtherance of the conspiracy, Defendant Berger, among other things, assigned tasks to Mississippi lawyers without any securities litigation experience, including Martin, as part of the Kickback Scheme, conducted a sham investigation over Bernstein's internally reported concerns, threatened Bernstein with a story about a "blackballed" whistleblower and terminated Bernstein for reporting the Kickback Scheme to the U.S. Attorney's Office.

136.     In furtherance of the conspiracy, Defendant Singer, among other things, directed Bernstein to allow Martin to continue to bill hours for unnecessary work after the primary defendants in the Satyam Litigation had settled, oversaw the drafting and filing of the Settlement

and Fee Submissions, which omitted any reference to Martin, and caused Martin to be paid $225,000 as part of the Kickback Scheme.

137.    In furtherance of the conspiracy, Defendant Graziano, among other things, conducted a sham investigation over Bernstein's internally reported concerns, participated in a meeting at which the Defendants resolved to terminate Bernstein for reporting the Kickback Scheme to the U.S. Attorney's Office, directed Bernstein not to communicate with Reynolds and threatened Bernstein that things would get "messy" and his ability to practice law would be "very difficult" if Bernstein made further disclosures of the Kickback Scheme.

138.    In furtherance of the conspiracy, Defendant Grossmann, among other things, caused Martin to be paid $225,000 as part of the Kickback Scheme, conducted a sham investigation over Bernstein's internally reported concerns, participated in a meeting at which the Defendants resolved to terminate Bernstein for reporting the Kickback Scheme to the U.S. Attorney's Office and offered to honor BLB&G's commitment to compensate Bernstein for his role in the Merck Litigation if Bernstein remained silent concerning the Kickback Scheme.

139.    In furtherance of the conspiracy, Defendant Silk, among other things, falsely represented to the court that having multiple firms representing the class in the Satyam Litigation would not result in duplicative work and participated in a meeting at which the Defendants resolved to terminate Bernstein for reporting the Kickback Scheme to the U.S. Attorney's Office.

140.    Bernstein was directly injured by the Defendants' retaliation against him for his disclosure of the Kickback Scheme in that the Defendants caused Bernstein to lose his job and his client of nine years.

141.    Accordingly, the Defendants are jointly and severally liable to Bernstein for treble damages, together with all costs for this action, plus reasonable attorney's fees as provided by 18 U.S.C. § 1964.

## THIRD CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (Against BLB&G)

142.    Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

143.    Pursuant to an implied agreement, Bernstein and BLB&G maintained an employment relationship during the Relevant Period.

144.    Pursuant to an oral agreement, Bernstein and BLB&G maintained an employment relationship during the Relevant Period.

145.    Bernstein performed under this agreement by fulfilling his obligations and responsibilities as an "of counsel" attorney at BLB&G.

146.    Both Bernstein and BLB&G shared an implied obligation under their employment agreement to comply with New York's rules of ethics.

147.    BLB&G had an implied duty to refrain from impeding or discouraging Bernstein's compliance with New York's rules of ethics.

148.    Rule 8.3(a) of the New York Rules of Professional Conduct requires a lawyer to report another lawyer's violation of the ethical rules that raises a "substantial question" as to that lawyer's honesty, trustworthiness or fitness.

149.    In its Settlement and Fee Submissions submitted in the Satyam Litigation, BLB&G falsely represented that attorney's fees would be paid only to the firms identified in the papers, which omitted any reference to Martin.

27

150.     BLB&G failed to correct the Settlement and Fee Submissions following its payment of Martin in October 2011.

151.     Bernstein reported this unethical conduct and his concerns about the Kickback Scheme to Defendant Graziano.

152.     Bernstein reported this unethical conduct and his concerns about the Kickback Scheme to the U.S. Attorney's Office.

153.     BLB&G retaliated against Bernstein for acting in compliance with New York's rules of ethics by devising a scheme to terminate Bernstein and interfere with his relationship with Reynolds.

154.     BLB&G retaliated against Bernstein for acting in compliance with New York's ethical rules by constructively and actually terminating Bernstein.

155.     BLB&G retaliated against Bernstein for acting in compliance with New York's ethical rules by wrongfully causing Reynolds to end his nine-year professional relationship with Bernstein.

156.     Bernstein has been unemployed since his termination by BLB&G.

157.     By reason of BLB&G's breach of its obligations under its agreement with Bernstein, Bernstein has suffered the loss of his salary and other compensation associated with his employment.

158.     Accordingly, BLB&G is liable to Bernstein for breach of contract in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS AND AIDING
## AND ABETTING TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS
### (Against All Defendants)

159.    Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

160.    Bernstein had a strong and enduring business relationship with Reynolds, which began shortly after plaintiffs commenced the Merck Litigation in November 2003.

161.    Reynolds followed Bernstein from Milberg, Bernstein's prior law firm, to Dreier.

162.    Reynolds followed Bernstein from Dreier to BLB&G.

163.    Bernstein was the primary, and for substantial periods, the only lawyer from BLB&G who communicated with Reynolds.

164.    Defendants wrongfully interfered with Bernstein's relationship with Reynolds and the absent class members Reynolds was appointed to represent.

165.    In communications shortly after Bernstein's termination, Defendants falsely informed Bernstein that Reynolds had already decided to remain with BLB&G rather than continue his relationship with Bernstein and wrongly directed Bernstein not to contact Reynolds. Bernstein reasonably relied on Defendants' false representations and refrained from contacting Reynolds for several days.

166.    In communications shortly after Bernstein's termination, Defendants falsely represented that the ethical rules precluded Bernstein from communicating with Reynolds. Bernstein reasonably relied on Defendants' false representation and refrained from contacting Reynolds for several days.

167.    Upon information and belief, in order to prevent Reynolds from leaving BLB&G and following Bernstein, Defendants made false and defamatory statements to Reynolds about

Bernstein's qualifications, experience and the circumstances of Bernstein's departure from BLB&G.

168.    Upon information and belief, Defendants concealed from Reynolds the Kickback Scheme and the true circumstances of Bernstein's departure from BLB&G.

169.    Defendants also sought to intimidate Bernstein to prevent him from communicating this information directly to Reynolds.  Defendants wrongfully directed Bernstein to cease communications with Reynolds, falsely stated that Bernstein would violate the rules of ethics by contacting Reynolds, and warned Bernstein that he would suffer adverse professional consequences if he disclosed any of the facts concerning the Kickback Scheme or the circumstances of his departure from BLB&G.

170.    By concealing and suppressing these facts, Defendants prevented Reynolds and the court from learning that BLB&G was selecting attorneys to perform tasks for Reynolds and other members of the class based on their connection to the Mississippi AG's Office rather than on the basis of their qualifications.  Defendants thereby placed their own interests above those of Reynolds and other members of the class in violation of their fiduciary duties to Reynolds and the class.

171.    By concealing and suppressing these facts, Defendants withheld information that was material to Reynolds's fiduciary duties to the class as a lead plaintiff in the Merck Litigation and to Reynolds's choice of counsel.

172.    Defendants interfered with Bernstein's relationship with Reynolds for the purpose of inflicting intentional harm on Bernstein and retaliating against him.

173.    Had it not been for Defendants' wrongful interference, Reynolds would have followed Bernstein to a new law firm and continued their attorney-client relationship.

174.     As a consequence of Defendants' tortious interference, Reynolds declined to follow Bernstein and ended their nine-year attorney-client relationship.

175.     Had Reynolds remained a client of Bernstein, Bernstein would have been entitled to an award of substantial fees upon a resolution of the Merck Litigation.

176.     As a direct and proximate result of Defendants' tortious interference and aiding and abetting tortious interference, Bernstein has suffered damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**QUANTUM MERUIT**
**(Against BLB&G)**

177.     Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

178.     Bernstein performed services as an attorney for BLB&G in the position of "of counsel."

179.     Bernstein performed these services in good faith.

180.     BLB&G accepted and benefitted from Bernstein's services.

181.     Because of Bernstein's services and efforts, Reynolds became a client of BLB&G.

182.     Bernstein expected to receive a minimum of 10 percent of the fees generated from BLB&G's representation of Reynolds.

183.     It is customary in the plaintiffs' class action bar for originating lawyers to receive a minimum of 10 percent of legal fees generated from clients he or she originates.

184.     BLB&G indicated that it would not pay this compensation to Bernstein unless he accepted certain conditions, including a commitment to conceal the Kickback Scheme, which Bernstein rejected.

185.     Bernstein is entitled to recover from BLB&G based on quantum meruit the full value of the services he performed for Defendants, including a reasonable percentage of the fees generated by BLB&G's representation of Reynolds.

**SIXTH CLAIM FOR RELIEF**
**<u>UNJUST ENRICHMENT</u>**
**(Against BLB&G)**

186.     Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

187.     Bernstein performed services as an attorney for BLB&G in the position of "of counsel."

188.     BLB&G benefitted from these services at Bernstein's expense.

189.     Because of Bernstein's services and efforts, Reynolds became a client of BLB&G.

190.     Bernstein expected to receive a minimum of 10 percent of the fees generated from BLB&G's representation of Reynolds.

191.     BLB&G will receive substantial fees as a consequence of its representation of Reynolds.

192.     BLB&G indicated that it would not pay this compensation to Bernstein unless he accepted certain conditions, including a commitment to conceal the Kickback Scheme, which Bernstein rejected.

193.     It is against equity and good conscience to permit BLB&G to retain the benefit of Bernstein's services without fully compensating him.

194.     BLB&G has thus been unjustly enriched in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against BLB&G)

195.     Bernstein repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

196.     BLB&G has communicated to Bernstein its position that the facts underlying the Kickback Scheme, including BLB&G's retention and payment of Martin and other local Mississippi law firms and their concealment of this information from the relevant courts, represent confidential information pursuant to Rule 1.6(a) of the New York Rules of Professional Conduct.

197.     BLB&G has communicated to Bernstein its position that Rule 1.9(c) of the New York Rules of Professional Conduct precludes Bernstein from disclosing facts relating to the Kickback Scheme in this action.

198.     BLB&G has taken the position that Bernstein will violate his ethical and/or fiduciary duties by disclosing facts relating to the Kickback Scheme in this action.

199.     A justiciable controversy exists concerning the confidentiality of the facts underlying the Kickback Scheme.

200.     Bernstein seeks a declaration that these facts do not constitute confidential information pursuant to Rules 1.6(a) and 1.9(c) of the New York Rules of Professional Conduct and may be disclosed in connection with this action without Bernstein's violation of his fiduciary and ethical duties.

## DEMAND FOR RELIEF

WHEREFORE, Bernstein prays for judgment against Defendants as follows:

1.     Granting Bernstein treble damages for his claims based on the Racketeering Influenced Corrupt Organization Act in an amount to be proven at trial;

2.     Granting Bernstein damages based on his common law claims in an amount to be proven at trial;

3.     Granting Bernstein his full costs and, pursuant to 18 USC 1964(c), reasonable attorney's fees;

4.     Granting Bernstein a declaratory judgment; and

5.     Granting Bernstein such other and further relief as the Court may consider equitable, just, and proper.


Dated:  New York, New York
         August 22, 2014


                              SHER TREMONTE LLP

                              By: _____
                                   Justin M. Sher
                                   Michael Tremonte
                              80 Broad Street, Suite 1301
                              New York, New York 10004
                              Tel: 212.202.2600
                              Email: jsher@shertremonte.com

                              *Attorneys for Plaintiff Bruce Bernstein*