UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
BRUCE BERNSTEIN,                          :
                                          :
                    Plaintiff,            :
                                          :
        -against-                         :
                                          :
BERNSTEIN LITOWITZ BERGER &               :
GROSSMANN LLP, MAX BERGER, STEVEN         :
SINGER, SALVATORE GRAZIANO, EDWARD        :
GROSSMANN, and GERALD SILK,               :
                                          :
                    Defendants.           :
-----------------------------------------------------------X
```

14-CV-6867 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

After unsuccessfully attempting to negotiate a settlement with his prior employer without

filing a lawsuit, Plaintiff Bruce Bernstein initiated this action against Bernstein Litowitz Berger

& Grossmann LLP ("Bernstein Litowitz" or "the firm")[1] and several of its senior partners. In his

Complaint, Bernstein alleges that the firm forced him to resign because he voiced concerns

regarding a "kickback scheme" whereby the firm was retained by the Mississippi Public

Employees Retirement System ("MPERS") to represent it in securities class actions in exchange

for the firm's paying legal fees to friends and relatives of employees of the Mississippi Attorney

General's Office for unnecessary, irrelevant, poor quality legal work. Compl. ¶ 2. Bernstein

filed the Complaint under seal, pursuant to a July 24, 2014, Order signed by Judge P. Kevin

Castel. Judge Castel's order provided that "it is doubtful that sealing is appropriate," but that

"[t]he action may be filed under seal and the sealing shall expire within 14 days of service of

process on defendants," which must be "within 7 days of filing." July 24, 2014 Order ("Sealing

Order"). Armed now with the ticking time bomb provided by the Court's order, Bernstein was

---

[1]     Bernstein is unrelated to Paul Bernstein, a founder and name partner of the firm

able to accomplish what he could not without the assistance of a filing in this Court: he negotiated a mutually acceptable settlement with the Defendants. The parties' settlement agreement was, however, contingent upon the Court's keeping the matter sealed. On September 5, 2014, the parties requested that the Court "enter an order that directs the Clerk of the Court to close the file on this case without ordering the file unsealed." Joint Letter of September 5, 2014.

In light of the fact that the Complaint and docket sheet are judicial documents to which a First Amendment and common law right of access attaches and in light of the weak private interests in preventing disclosure of the information contained therein, the Court orders that the Complaint and the docket sheet be unsealed. This order shall be stayed for 30 days to provide the parties an opportunity to appeal the decision.

## BACKGROUND[2]

Bernstein, a plaintiff-side attorney, has a history of poorly choosing his employers. Early on he began working at Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg"), a large plaintiffs' firm. Compl. ¶ 19. While there, he worked on a large securities class action case and developed a relationship with one of the lead plaintiffs ("Lead Plaintiff") in that case. *Id.* ¶¶ 20-21. When Mr. Milberg was indicted, Bernstein left the firm and became a partner at Dreier LLP; the Lead Plaintiff followed Bernstein to Dreier. *Id.* ¶¶ 22-24. In 2008, Bernstein left Dreier (after Mr. Dreier was indicted) to work at Bernstein Litowitz; the Lead Plaintiff again followed him to the new firm. *Id.* ¶¶ 26, 28.

While at Bernstein Litowitz, Bernstein worked on a multidistrict securities class action, *In re: Satyam Computer Services Ltd. Securities Litigation*, No. 09-MD-2027(JPO), in which the firm represented MPERS, one of the lead Plaintiffs, in a case pending in the Southern District of

---

[2] The facts laid out here are taken entirely from the Complaint, except where otherwise noted.

2

New York. *Id.* ¶ 32. Bernstein alleges that Defendant Steven Singer and an associate told him about a solo practitioner in Mississippi who "would occasionally check on the status of the case for MPERS, even though [the firm] was already providing this information directly to the Office of the Mississippi Attorney General." *Id.* ¶¶ 34, 36. After there was an agreement in principle to settle the *Satyam* case, the Mississippi attorney provided her timesheets to Bernstein Litowitz, indicating that – although she had produced no written work – "she had spent approximately 50 hours on various tasks." *Id.* ¶ 38. In a conference call thereafter, Defendant Max Berger allegedly "assigned two unnecessary legal research projects" to the Mississippi attorney; these projects led to an unnecessary 18-page memorandum "which addressed the wrong pleading and contained no meaningful legal analysis." *Id.* ¶¶ 39, 44, 46. Singer rebuffed Bernstein's protestations about assigning the attorney unnecessary work, asking Bernstein: "Do you ever want us to work with Mississippi again?" *Id.* ¶ 42.

After the settlement was final, Bernstein claims that he followed up and learned, to his dismay, that the Mississippi attorney had received $225,000, comprised of $112,500 from Bernstein Litowitz and $112,500 from the co-lead plaintiffs' law firm, for her efforts on the *Satyam* case. *Id.* ¶ 53.[3] The Mississippi attorney was not mentioned on the firm's fee application to the Court. *Id.* ¶ 50.[4] Unhappy with her work and her hefty compensation,

---

[3]     The Mississippi attorney "reported working a total of 207 hours on the Satyam Litigation," Compl. ¶ 44, although most of this time was spent producing an irrelevant memorandum after the conclusion of the case, *id.* Even if this work represents only the work that she did for Bernstein Litowitz (and if she did an equal amount of work for the firm that paid the other $112,500), which is unclear from the Complaint, she was paid approximately $550 per hour, a rate well above what would appear to the "going rate" for Mississippi attorneys. *Cf. United States ex rel Rigsby v. State Farm Fire & Cas. Co.*, No. 06-CV-433(HSO), 2014 WL 691500, *14 (S.D. Miss. Feb. 21, 691500) (the typical rate for a Jackson, Mississippi attorney with 20 years' experience in commercial litigation was approximately $250 to $450 per hour); *see also Payne v. Univ. of S. Miss.*, No. 12-CV-41(KS)(MTP), 2013 WL 2445031, at *2 (S.D. Miss. June 5, 2013) (two attorneys more analogous to the standard work of the Mississippi attorney here at issue "billed at the average rate of $152.50" per hour). If the reported 207 hours was the full amount of work that the Mississippi attorney did on the case, her hourly rate of pay was in excess of $1000 per hour.

[4]     Defendants did not include the Mississippi attorney's hours (or the hours of "four [other] unidentified firms" who also worked on the litigation) when reporting their hours for the district court's lodestar calculations.

Bernstein continued to inquire about the arrangement; he ultimately learned that the Mississippi attorney, "who had been admitted to the Mississippi bar approximately five years before the filing of the Satyam Litigation[,] had no securities litigation experience prior to the Satyam Litigation and was married to a Special Assistant Attorney General in the Mississippi AG's Office." *Id.* ¶ 56.[5] Bernstein avers that he told the senior partners his concerns about the ethical implications of payments to an underqualified relative of a representative of the people of Mississippi. *Id.* ¶ 57. The partners did not share his concern and told him "that the Mississippi AG was under pressure to use 'minority firms,'" *id.* ¶ 63, and that "'Mississippi likes to have local counsel,'" *id.* ¶ 83.[6] Bernstein alleges that he developed "similar concerns" related to other cases in which the firm assigned work to friends or relatives of members of the Mississippi Attorney General's Office. *Id.* ¶¶ 76-82.

After several contentious meetings with firm leadership, and "[r]ecognizing that his termination was inevitable," Bernstein resigned. *Id.* ¶ 95. Unlike his previous departures, this time Bernstein was unable to convince the Lead Plaintiff to accompany him to a new firm. *Id.* ¶ 106. His dispute with Bernstein Litowitz, as reflected in his Complaint, included the fact that he was not compensated the "customary . . . minimum of 10 percent of legal fees generated from" "his" client when he left. *Id.* ¶¶ 183-84.

---

Supp. Mem. at 3. They point out that under local rules there was apparently no requirement to disclose fee-sharing arrangements. *Id.* at 4-5. The rule automatically requiring such disclosure was replaced, three weeks before Defendants' fee petition was submitted, with a rule allowing courts to request disclosure of fee-sharing agreements. *Compare* Solomon Decl. Ex. K R. 23.1.1 *with* Fed. R. Civ. P. 54(d)(2)(B)(iv).

[5] The Mississippi attorney's spouse works in a child welfare unit of the Attorney General's Office and is responsible for prosecuting failure to pay child support cases. Solomon Decl. Exs. X-Y.

[6] An independent search of publicly-available records reveals that the Mississippi attorney has appeared as a co-counsel of the attorney from the Mississippi Attorney General's Office who allegedly caused Bernstein Litowitz to employ her, including at least one case in this District. She did not formally appear in the *Satyam* case but has been an attorney of record in other large class actions on behalf of the state of Mississippi.

During a prolonged period of unemployment following his departure from the firm, *id.* ¶¶ 114-16, Bernstein engaged in two confidential mediation sessions with the firm, Tr. at 3. The firm mentioned during those mediation sessions its belief that Bernstein's substantive problems with the firm were based on confidential client information that is protected by Rule 1.9 of the New York Rules of Professional Conduct. *Id.* at 5. Thus, before filing this action, Bernstein obtained an opinion from ethics counsel indicating that his "claims [were] neither privileged nor confidential under the New York Rules of Professional Conduct." Sher Letter of July 24, 2014. Bernstein nevertheless sought "an order sealing all materials filed in this case until the Court resolves the[] issue[] of confidentiality." *Id.* Judge Castel (who acted on the motion as the Part I judge) granted the motion, finding that:

> Under the authority of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006), it is doubtful that sealing is appropriate. However, in abundance of caution, I will order as follows:
>
> 1. The action may be filed under seal and the sealing shall *expire* within 14 days of service of process on defendants unless extended by order of the Judge to whom the case is assigned.
> 2. Service of process shall be made within 7 days of filing. A copy of this Order shall be served on all defendants.

Sealing Order (emphasis in original). Bernstein, allegedly still undecided about filing his complaint, supposedly verified with the Records Management Unit of the Court that "if the action were discontinued prior to the expiration of the Sealing Order," "the Complaint and Sealing Order . . . would remain sealed permanently." Bernstein Decl. ¶ 8. There is no evidence that he asked the Part I judge to include such a provision in the actual sealing order.

On August 22, 2014, Bernstein filed the Complaint under seal. *Id.* ¶ 9. He avers that he understood that he would have options – if the Court determined "that [he] was permitted under the ethical rules to pursue [his] claims, [he] intended to do so regardless of whether the case remained sealed," and "[i]f the Court determined that the information was confidential and that

[he] was precluded from pursuing [his] claims, [he] understood that [he] would have the option of discontinuing this action before the case was unsealed." *Id.* ¶¶ 4-5. Shortly after he served the Complaint, Bernstein settled with the Defendants. *Id.* ¶ 10. The Settlement Agreement, however, "includes a provision that voids the settlement if this action is unsealed or otherwise becomes public." *Id.* ¶ 11. The parties therefore sought to dismiss this action before the sealing order expired, believing that doing so would ensure that the Complaint would never see the light of day. Joint Letter of September 5, 2014.

This Court ordered that the case would remain sealed pending further order and instructed the parties to brief and argue whether under Second Circuit precedent the case should remain under seal. September 12, 2014 Order. The parties' joint brief and argument focused almost exclusively on their belief that the Complaint is not a "judicial document." The Court ordered the parties to submit additional briefs addressing the public interest in disclosure and the private interest in maintaining the confidentiality of the Complaint and docket sheet. September 22, 2014 Order. The Court also ordered Defendants to submit a proposed redacted version of the Complaint redacting only those provisions that the Defendants contend revealed confidential client information.[7]

---

[7]     The Defendant submitted a redacted Complaint that did not comply with the order; the proposed redaction eliminated information that was not even arguably confidential client information. Defendants' proposed redactions encompass (1) all client names, case names, and allegations from which client or case names could be deduced; (2) any mention of the existence of a "kickback scheme," a RICO claim, or a *quid pro quo* arrangement, regardless of whether the context of the reference would tend to identify any client; (3) Bernstein's alleged internal and external reports of his ethical discomfort and the firm's response; and (4) all communications involving the Lead Plaintiff in the unrelated case, including allegations that the Firm had publicly challenged his suitability for that role prior to his becoming a client of the Firm. In all, the Defendants completely redacted 146 out of 220 paragraphs in the Complaint and partially redacted 25 more; what is left is Bernstein's resume, paragraphs "repeat[ing] and realleg[ing] each of the foregoing paragraphs," *e.g.* Compl. ¶ 132, and the hint that Bernstein likely believes he is owed money for bringing an unidentified client to the firm, Solomon Decl. Ex. A ¶¶186-91.

## DISCUSSION

"The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." *United States v. Erie Cnty., N.Y.*, 763 F.3d 235, 238-39 (2d Cir. 2014). "The presumption of access is based on the need for federal courts, although independent – indeed, particularly because they are independent – to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*"). "The common law right of public access to judicial documents is said to predate the Constitution." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*"). By now it is "well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." *Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014). Although "'the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access,'" an item is a "judicial document" if it is "'relevant to the performance of the judicial function and useful in the judicial process.'" *Lugosch*, 435 F.3d at 119 (quoting *Amodeo I*, 44 F.3d at 145).

In applying these principles to determine whether sealing is appropriate in a particular case, courts conduct an inquiry that has several stages. First, courts inquire whether the document is a "judicial document" to which a presumption of access would attach. *See Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 167 & n.15 (2d Cir. 2013). If it is, courts ask whether the presumption of access is the common law right of access or the more robust "'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). If the Court determines that the documents at issue "are subject to a First Amendment right of access," it then looks only to whether it can make "'specific, on-the-record findings that

higher values necessitate a narrowly tailored sealing.'" *Erie Cnty.*, 763 F.3d at 241, 243 (quoting *Lugosch*, 435 F.3d at 126). On the other hand, when courts determine that the common law presumption of access attaches, they "determine the weight of the presumption and measure it against competing considerations." *Id.* at 241; *see also Amodeo II*, 71 F.3d at 1048-53. In any case in which some sealing of a judicial document is appropriate, the Second Circuit has directed that the Court should determine whether partial redaction of the private material is "a viable remedy," or whether the document presents "an all or nothing matter." *Amodeo II*, 71 F.3d at 1053; *see also IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013).

## I.  Jurisdiction to Unseal the Case

The parties do not meaningfully challenge the Court's jurisdiction, but the Court notes that the Plaintiff has filed a Notice of Dismissal purporting to "dismiss[] this action without prejudice" pursuant to Rule 41(a)(1)(A)(i).[8] Generally, such a filing "divests the court of its jurisdiction over a case, irrespective of whether the district court approves" or so-orders the filing. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 139 (2d Cir. 2004). "It is well established that a federal court may consider collateral issues after an action is no longer pending." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). "It is, moreover, fundamental that 'every court has supervisory power over its own records and files.'" *Gambale*, 377 F.3d at 140 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)) (alteration omitted). "The court's supervisory power does not disappear because jurisdiction over the relevant controversy has been lost." *Id.* at 141. Accordingly, "[a] district court that concludes that there is a public right of access to judicial documents . . . acts within its jurisdiction when it modifies or vacates a

---

[8]     Rule 41(a)(1)(A)(i) provides that a "plaintiff may dismiss an action without a court order by filing a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." It is undisputed that Plaintiff timely filed his notice of dismissal.

protective order to allow that access, irrespective of whether it does so before or after a stipulation [or notice] of dismissal has been filed." *Id.* at 142.

## II.  Judicial Documents

When determining whether filings are judicial documents, "[t]he focus of [courts'] analysis is on whether the [filings] are 'relevant to the performance of the judicial function and useful in the judicial process.'" *Erie Cnty.*, 763 F.3d at 240 (quoting *Lugosch*, 435 F.3d at 119). Documents that are attendant to the undisputed presumption of a public right to attend both civil and criminal proceedings are "judicial documents." *Hartford Courant*, 380 F.3d at 93; *see also Public Citizen*, 749 F.3d at 268. Because of the legal significance of a document's description as a "judicial document," "the category of 'judicial documents' should not be readily expanded. The fact that a document is relevant to the subject matter of a judicial proceeding, or that the proceeding was in some way stimulated by the document, does not make it public." *Newsday*, 730 F.3d at 167 n.15.

Applying these principles, the Second Circuit has held that documents submitted in support of or in opposition to a motion for summary judgment are "judicial documents," irrespective of whether the motion for summary judgment in fact terminates a case. *Lugosch*, 435 F.3d at 122 (citing *Republic of Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir. 1991)); *see also Joy v. North*, 692 F.2d 880 (2d Cir. 1982); *but see In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1336 (D.C. Cir. 1985) (Scalia, J.) (drawing a distinction between documents in cases pre- and post-judgment). In *Lugosch*, the Circuit addressed the right of access to documents submitted in opposition to a motion for summary judgment that the district court had not yet decided, holding that such documents "are – as a matter of law – judicial documents to which a strong presumption of access attaches." *Id.* at 121. The fact that

the documents were "submitted to the court as supporting material in connection" with the motion rendered them "unquestionably judicial documents." *Id.* at 123.

The Circuit has also held documents submitted outside of the context of a pending motion to be "judicial documents." Notably, the *Amodeo* cases dealt with a consent decree entered by the parties in a RICO action brought by the United States against Local 100 of the Hotel Employees & Restaurant Employees International Union. *Amodeo I*, 44 F.3d at 143. A court officer charged with overseeing the enforcement of the decree periodically filed reports with the court. *Id.* One of the reports described legal services provided to Local 100 by (*inter alia*) Harold Ickes, who subsequently became Deputy Chief of Staff to President Bill Clinton. *Id.* at 144. When Newsday sought access to that report, the Second Circuit held that it was a judicial document to which a presumptive right of access attached. *Id.* at 146. Similarly, in *Erie County*, the Circuit held that compliance reports filed pursuant to a settlement agreement, detailing the steps that Erie County took to reduce the number of suicides in its prisons, were judicial documents. 763 F.3d at 240. The Circuit was unpersuaded by the parties' arguments that the documents were not judicial documents because the district court had not yet acted on or adjudicated an enforcement of the agreement. "'In light of the District Court's inherent 'supervisory power over its own records and files,' even the District Court's inaction is subject to public accountability." *Id.* (quoting *Nixon*, 435 U.S. at 597) (internal citation omitted).

Of course not every document filed in court is a "judicial document." In *Newsday*, the Circuit dealt with a sensitive internal affairs report produced by the Nassau County Police Department. 730 F.3d at 159. The report had been provided pursuant to a protective order to legislators in advance of a legislative hearing as to whether to approve a civil settlement. *Id.* at 160-61. In a subsequent civil contempt hearing against one of the legislators, adjudicating whether he had disclosed information that he allegedly could have gleaned only from the report,

the Circuit held that the underlying report itself was not a judicial document. *Id.* at 166-67. The

district court judge had not read the report and its contents were not at issue during the hearing –

the report was not, therefore, a judicial document. *Id.*

### A. The Docket Sheet Is a Judicial Document

It is the clear law of this Circuit that civil docket sheets "enjoy a presumption of openness

and that the public and the media possess a qualified First Amendment right to inspect them."

*Hartford Courant*, 380 F.3d at 96. "The ability of the public and press to inspect docket sheets is

a critical component to providing meaningful access to civil proceedings. The docket sheet

provides onlookers an overview of the court proceedings and allows them to ascertain the parties

to the case, the materials that have been filed, and the trial judge's decisions." *Public Citizen*,

749 F.3d at 268 (collecting cases). "By inspecting materials like docket sheets, the public can

discern the prevalence of certain types of cases, the nature of the parties to particular kinds of

actions, information about the settlement rates in different areas of law, and the types of

materials that are likely to be sealed." *Hartford Courant*, 380 F.3d at 95-96; *see also Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). Access to docket sheets, moreover, is "a

necessary corollary of the capacity to attend the relevant proceedings." *Id.* at 93. "[D]ocket

sheets provide a kind of index to judicial proceedings and documents, and endow the public and

press with the capacity to exercise their rights guaranteed by the First Amendment." *Id.*

The parties point to a 2009 Federal Judicial Center analysis of cases that were adjudicated

entirely under seal in 2006 – specifically focusing on the sheer number (576) – as a basis for

determining that no documents in this case are judicial documents. Joint Mem. at 2, Tr. at 13-14

(citing *Sealed Cases in Federal Courts*, FED. JUDICIAL CENT. (Oct. 23, 2009),

http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Sealed-Cases.pdf (accessed January

10, 2015)). The Judicial Center report briefly describes the reasons that these 576 cases were

entirely sealed. The plurality of such cases were *qui tam* actions, sealed pursuant to the False

Claims Act, 31 U.S.C. § 3730(b)(2). *Id.* at 4. Other reasons cases were completely sealed

included the identification of witnesses cooperating with law enforcement, identification of

victims of childhood abuse and other actions involving children, grand jury matters, and

revelation of national secrets (for example, information pertaining to intellectual property

involved in nuclear weapons). *Id.* at 4, 8. Nineteen cases were "sealed because the parties

wanted them sealed," *id.* at 4; this was the reason cited, for example, in a case alleging rape by a

high-profile athlete, *id.* at 12. Many cases were unsealed when the Center sent inquiries to courts

as to why they were sealed. *Id.* at 21. Nothing about that study suggests that docket sheets are

not traditionally public; in fact, the report indicates that it is "Judicial Conference policy to post

redacted docket sheets for sealed cases." *Id.* at 2.

The Court notes, however, that finding the docket sheet to be a judicial document does

not end the inquiry; there is a presumption of access, but "[o]f course, this presumption is

rebuttable upon demonstration that suppression 'is essential to preserve higher values and is

narrowly tailored to serve that interest.'" *Hartford Courant*, 380 F.3d at 96 (quoting *Press-*

*Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510 (1984)) (other internal

quotation marks and citation omitted).

## B. The Complaint Is a Judicial Document

The parties vigorously dispute the Court's view that the Complaint is a judicial document

subject to a presumptive right of access. Joint Mem. 6-10. They rely heavily on

decontextualized language from *Amodeo II*, indicating that "[d]ocuments that play no role in the

performance of Article III functions, such as those passed between the parties in discovery, lie

entirely beyond the presumption's reach." 71 F.3d at 1050. But of course the *Amodeo II*

decision "relates only to the weight of the presumption of access, not to whether something is a judicial document to begin with." *Lugosch*, 435 F.3d at 122.[9]

The parties point to three district court cases in which courts have found that certain attachments to motion papers that were not considered by the court and played no role in an adjudication did not constitute "judicial documents." *See, e.g., Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, No. 13-CV-6703(PKC), 2013 WL 6171315, at *6-7 (S.D.N.Y. Nov. 25, 2013) (unused attachments to a motion to compel arbitration); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, No. 05-CV-2745(JGK)(RLE), 2010 WL 779314, at *3-4 (S.D.N.Y. Mar. 2, 2010) (attachments to submission in support of a motion for an injunction mooted by the parties' stipulation); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 621 F. Supp. 2d 55, 66 (S.D.N.Y. 2007) (documents inappropriately attached in support of motion to dismiss). No doubt there are many other cases in which business records that are attached to parties' motions are not "judicial documents." But all of those cases have one more thing in common: in each case, the "civil action [was] commenced by filing a complaint with the court," a process that involved the use of public resources to effect the goals of the parties. Fed. R. Civ. P. 3. In none was the complaint held to be something other than a "judicial document."

The parties cite to one district court case in which the complaint was deemed "not essential to an adjudication" because "the parties ha[d] settled the dispute and the suit [was] dismissed with prejudice." *Bergen Brunswig Corp. v. Ivax Corp.*, No. 97-CV-2003(PKL), 1998 WL 113976, at *3 (S.D.N.Y. Mar. 12, 1998). In that case, Judge Leisure, acting well before the Circuit had laid out the full framework for analyzing whether a document should remain sealed

---

[9]      The documents at issue in *Amodeo II* were already held to be "judicial documents" in *Amodeo I*. *See Amodeo II*, 71 F.3d at 1047 ("In the first appeal, . . . we held that the Report was a 'judicial document' and thus 'presumptively' subject to public inspection.").

or be unsealed, conducted a balancing test. He weighed the amount of effort expended by the court, holding it to be minimal as there was no evaluation of the merits of the case. *Id.* at \*5. But the sort of analysis conducted by Judge Leisure is now included as part of a larger balancing test – the court must also weigh the public interest in the complaint and the harm that would result from disclosure. *Id.* at \*3. This balancing test only comes into play after a document has been held to be a judicial document subject to the presumption of access; the *strength* of the presumption can vary based on "the role of the material at issue in the exercise of Article III judicial power." *Amodeo II*, 71 F.3d at 1049. Judge Leisure held that the presumption as to the complaint in *Bergen* was weak, but by so holding he implicitly first decided that it was a "judicial document."

Finally, the parties argue that the *Newsday* case militates against holding the Complaint in this case to be a judicial document. Indeed, *Newsday* admonishes courts not to expand the category of judicial documents. Even though the civil contempt proceeding at issue in *Newsday* "was, in some sense, about" the internal affairs report whose content the legislator was accused of leaking, "this in itself [was] not sufficient to find the Report a judicial document." *Newsday*, 730 F.3d at 167. But there, the report was not the document that initiated the action; it was a large part of the factual basis for the legal documents that initiated the action. The report had an existence that predated the judicial proceeding and that was independent of the judicial proceeding. Finally, the judicial proceeding did not involve review of the report. That is wholly distinct from this case, in which the closest analogy to the internal affairs report in *Newsday* would be the employment agreement (if one existed) between Bernstein Litowitz and Bernstein, or between the firm and the Mississippi lawyer it allegedly paid for inappropriate reasons.

If, as the Eighth Circuit has suggested, there is an "historical case to be made that a civil complaint filed with a court, but then soon dismissed pursuant to settlement, is not the sort of

judicial record to which there is a presumption of public access," *IDT Corp.*, 709 F.3d at 1223 –

a proposition that New York courts found antiquated even in 1927, *see Campbell v. N.Y. Evening*

*Post*, 245 N.Y. 320, 327 (1927) – the parties have not made the case here. Moreover, despite its

allusions to the contrary, even the Eighth Circuit has taken heed of and applied the "modern

trend in federal cases to treat pleadings in civil litigation (other than discovery motions and

accompanying exhibits) as presumptively public, even when the case is pending before judgment

or resolved by settlement." *IDT Corp.*, 709 F.3d at 1223 (collecting cases) (internal citations

omitted).

    A complaint is the quintessential judicial document. A complaint is the invocation of the

power of one branch of government to resolve an otherwise-private dispute. Complaints play a

role in every civil adjudication in federal court, and the filing of a complaint, even a complaint

dismissed immediately and without prejudice, may substantively affect the parties' rights. *See,*

*e.g.,* Fed. R. Civ. P. 41(d). "[T]he filing of a pleading is a public and official act in the course of

judicial proceedings." *Campbell*, 245 N.Y. at 328. The fact that sometimes countervailing

concerns militate in favor of sealing these otherwise public documents is not at odds with the

existence of a rebuttable presumption of public access that attaches to every complaint.

## III. First Amendment and Common Law Presumptions of Public Access[10]

    The next step in determining whether the documents at issue should remain sealed is the

question of whether the First Amendment presumption of access attaches, as "'the common law

---

[10] The Court is "[m]indful of the Supreme Court's injunction not to make unnecessary constitutional adjudications." *N.Y. Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 302 n.12 (2d Cir. 2011) (citing *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936)). The Court nevertheless views the path charted by the Circuit in *Erie County*, in which it first evaluated whether the First Amendment right of access attached, as the most logical course for this analysis. 763 F.3d at 241. "The prudential rule against reaching constitutional issues unnecessarily does not require a vain excursion through areas of law considered potentially helpful by neither the parties nor the court." *Reporters Comm.*, 773 F.2d at 1340 (internal citation omitted).

does not afford as much substantive protection to the interests of the press and the public as does the First Amendment.'" *Lugosch*, 435 F.3d at 124 (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)) (alteration omitted). Two reasons compel the conclusion that the Complaint is protected by the qualified First Amendment presumption of access.[11]

First, like docket sheets, access to complaints is "a necessary corollary of the capacity to attend the relevant proceedings," which is protected by a qualified First Amendment right. *Hartford Courant*, 380 F.3d at 93. Without a complaint, inspection of docket sheets might not achieve the salutary effect that the Circuit predicted in *Hartford Courant*. *Id.* at 95-96 ("By inspecting materials like docket sheets, the public can discern the prevalence of certain types of cases, the nature of the parties to particular kinds of actions, information about the settlement rates in different areas of law, and the types of materials that are likely to be sealed."). Complaints can – and frequently do – contain allegations that range from exaggerated to wholly fabricated. *See, e.g., Waltman v. S.E.C.*, No. 14-CV-1574(VEC), Dkt. 2 (S.D.N.Y.) (alleging that by failing adequately to investigate fraud by Steven A. Cohen, the Securities and Exchange Commission enabled unknown others to conspire to murder plaintiff and to block several $20 billion clean energy sales). That is the nature of judicial proceedings – not everything alleged by one party can or should be taken as ground truth. Still, the pleadings can and do properly frame the proceeding and provide outer boundaries on the claims advanced, the materials adduced, and the redress sought during judicial proceedings. Understanding these boundaries – and knowing what precisely a case is about – is a "necessary corollary" to the right to attend the proceedings.

---

[11] It is settled law that "docket sheets enjoy a presumption of openness and [] the public and the media possess a qualified First Amendment right to inspect them." *Hartford Courant*, 380 F.3d at 96. This opinion therefore discusses only the Complaint.

Moreover, "'experience and logic' support making the [Complaint] available to the public." *Erie Cnty.*, 763 F.3d at 239 (quoting *Lugosch*, 435 F.3d at 120). In evaluating "experience," courts consider "whether the documents 'have historically been open to the press and general public.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120). In the context of pleadings, the answer is yes, even where there may be some sensitive information contained in a complaint. The Court declines to "point[] to several instances where [documents] like the ones at hand have been accessible," *id.* at 241, because there are approximately 10,000 every year in this District alone. Complaints have been regarded as public for a long time, *see Campbell*, 245 N.Y. at 328, and are filed publicly *even when there is arguably sensitive information in the complaint. See, e.g., Anonymous Plaintiff v. City of New York*, 13-CV-8928(VEC), Dkt. 1 (S.D.N.Y.); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 187 (2d Cir. 2008); *see also In re N.Y. Times Co.*, 577 F.3d 401, 410 (2d Cir. 2009) (unlike other documents, wiretap applications "have been subject to a statutory presumption *against* disclosure") (emphasis in original).

Logic supports complaints' being public in the same way that it supports the openness of docket sheets. Complaints, like docket sheets, contribute to the public's ability to understand judicial proceedings; and a public understanding of the courts is necessary for the judicial branch's accountability and legitimacy. *Cf. Hartford Courant*, 380 F.3d at 95-96. If a complaint is sealed, obscuring the subject matter of a proceeding, then the public will be unaware that the allegation has been levied and that public resources (be they administrative resources, the court's attention, or the court's judgment and discretion) are being brought to bear on a particular dispute. There is a "repugnant aspect to depriving the public and press access to [complaints]: no one can challenge closure of a document or proceeding that is itself a secret." *Public Citizen*, 749 F.3d at 268. Like docket sheets, "access to [complaints] is integral to providing meaningful access to civil proceedings." *Id.* at 269. And the public has a right to know how its resources are

being used – courts are funded by the public, judges are evaluated by the public, officials who appoint and approve judges are voted on by the public, and the laws under which parties sue may be refined, rescinded, or strengthened based on the public's views of the ways in which they play out in court. When a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends. Logic therefore strongly endorses the historical default that complaints are public documents. Consistent with experience and logic, the presumption of public access to complaints is protected by the First Amendment.

## IV. Exceptions to the Presumptive First Amendment Right of Access

"Recognizing that the First Amendment applies and protects the public's right of access does not end the matter, however," as "even [a First Amendment right] can be overcome by 'specific, on-the-record findings that higher values necessitate a narrowly tailored sealing.'" *Erie Cnty.*, 763 F.3d at 243 (quoting *Lugosch*, 435 F.3d at 126); *see, e.g., Fairfield Sentry Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 140 (2d Cir. 2013) ("Important as public access to court documents may be, it is not an exceptional and fundamental value. It is a qualified right."). The Second Circuit has strongly suggested that protection of attorney-client privilege is a "higher value" that would trump the First Amendment presumption of access. *See Erie Cnty.*, 763 F.3d at 243; *Lugosch*, 435 F.3d at 125 ("attorney-client privilege might well be such a compelling reason"); *Diversified Grp., Inc. v. Daugerdas*, 217 F.R.D. 152, 160 (S.D.N.Y. 2003) ("[T]he confidentiality of attorney-client communications . . . 'is precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records.'") (quoting *Siedle v. Putnam Invs.*, 147 F.3d 7, 11 (1st Cir. 1998)).

The parties invoke this line of authority to argue that protection of confidential client information under Rules 1.6 and 1.9 of New York's Rules of Professional Conduct also provides an exception to the public's constitutional right to access judicial documents. The ethical duty to keep client confidences "is broader than the attorney-client privilege, and exists 'without regard to the nature or source of information or the fact that others share the knowledge.'" *Wise v. Consol. Edison Co. of N.Y.*, 282 A.D.2d 335, 335 (1st Dep't 2001) (quoting *Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979)) (other quotation marks and citation omitted); *see also Doe v. A Corp.*, 330 F. Supp. 1352, 1355 (S.D.N.Y. 1971), *adopted sub nom. Hall v. A Corp.*, 453 F.2d 1375, 1376 (2d Cir. 1972) (*per curiam*). The Court is skeptical of the parties' assertions that any breach of this broader ethical duty should be treated identically to a breach of the narrower and more venerable attorney-client privilege. Courts "construe the [attorney-client] privilege narrowly because it renders relevant information undiscoverable." *Pritchard v. Cnty. of Erie (In re Cnty. of Erie)*, 473 F.3d 413, 418 (2d Cir. 2007). Permitting the protections for attorney-client privileged materials to extend to the much broader duty of confidentiality would undermine the logic behind limiting this "sacrosanct" privilege. *Collins v. City of New York*, No. 11-CV-766(FB)(RML), 2012 WL 3871751, at *2 (E.D.N.Y. Sept. 6, 2012).[12] Accordingly, determining whether the ethical concerns raised by providing public access to a judicial document outweigh the public's constitutional right of access must be done on a case-by-case basis.[13] In this case, notwithstanding Defendants' arguments to the contrary,

---

[12] The parties cite to one district court case in which the court appeared to assume, without analysis, that the same protection should be afforded to "client communications" and privileged information. *See Equal Emp't Opportunity Comm'n v. Kelley Drye & Warren LLP*, No. 10-CV-655(LTS), 2012 WL 691545, at *4 (S.D.N.Y. Mar. 2, 2012) (citing *Diversified Grp.*, 217 F.R.D. at 162). This dictum is not binding.

[13] For the reasons discussed in Part V *infra*, if a possible breach of an attorney's ethical duty to his client could furnish a basis to limit the public First Amendment right of access to judicial proceedings, and if such a breach were demonstrated in this case, the breach alleged here would not be so significant as to outweigh the constitutional right of access.

the Complaint does not implicate the broader ethical duty of an attorney not to disclose confidential information of a former client.

Regardless of whether the allegations in the Complaint are true, the ethical duty that Defendants invoke does not apply. If the allegations are fanciful, then no confidential information has been disclosed. If they are true, Bernstein has not breached an ethical duty owed to his clients – MPERS and the people of Mississippi. *See* Green Decl. at 2 n.1. Defendants' bald assertion that the revelation of misconduct by a specific member of the Attorney General's Office would be embarrassing to the people of Mississippi or MPERS is illogical. *See* Green Decl. ¶ 30. To support this far-fetched claim, Defendants rely on a letter from the "client" asserting that revelation of the scheme "could subject Mississippi and its agency MPERS in [sic] a negative light." Solomon Decl. Ex. F at 4. But this assessment was made by the very attorney who is alleged to have directed the firm to pay kickbacks to attorneys who are related to members of his office. Compl. ¶¶ 42, 77. The Court has struggled to understand how the people of Mississippi would be harmed by learning of their agents' self-dealing; to the contrary, if the allegations are true, learning of the scheme would allow the citizenry to decide for themselves whether such conduct comports with their views of proper conduct by state officials.

Moreover, communications regarding a client's choice of attorney are not typically "confidential" within the meaning of Rule 1.6.[14] Defendants concede that the Complaint does

---

[14] Rule 1.9(c) prohibits attorneys from using "confidential information of [a] former client protected by Rule 1.6 to the disadvantage of the former client" or revealing such information. Rule 1.6(a) defines "confidential information" as:

> [I]nformation gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the *client* if disclosed, or (c) information that the client has requested be kept confidential. "Confidential information" does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates.

Emphasis added.

not reveal information "protected by the attorney-client privilege," but assert that the Complaint contains confidential client communications that are "likely to be embarrassing or detrimental to the client if disclosed" and "information that the client has requested to be kept confidential." N.Y. Rules of Prof'l Conduct 1.6(a). As discussed above, the Court is not persuaded that the *people of Mississippi*, as opposed to their allegedly self-dealing agent, would be harmed by learning of alleged corruption of subordinates of elected officials who are supposed to be operating on their behalf.

The request to keep the alleged kickback scheme confidential was made by the member of the Attorney General's Office whose conduct is discussed in the Complaint. Solomon Decl. Exs. F-G; Compl. ¶¶ 42, 77. Insofar as this request (and perhaps even the underlying scheme) was adverse to the interests of MPERS, for the purpose of applying the ethical rule, the Court does not presume that the attorney's request for confidentiality signifies the *client's* desire. *Cf. Sieger v. Zak*, 60 A.D.3d 661, 663 (2d Dep't 2009) (individual who at times communicated on behalf of a corporation "was not an agent for the purpose of making the subject communications" and attorney-client privilege therefore did not apply). Demands that Bernstein keep secret his reports of wrongdoing by the Attorney General's Office are directly contrary to the welfare of Mississippi and MPERS and protect only the alleged wrongdoers. If the Attorney General's Office attorneys in fact perpetrated this scheme and demanded Bernstein's silence, they "'totally abandoned [their] principal's interests and [were] acting entirely for [their] own or another's purposes.'" *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) (quoting *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 784-85 (1985)).[15]

---

[15] Any ethical duty would flow from the relationship between the people of Mississippi (and MPERS) and Bernstein Litowitz. When public officials, acting on behalf of their constituents, speak with the public's attorneys, privilege and ethical duties extend to those conversations. *See In re Grand Jury Investigation*, 399 F.3d 527, 536 (2d Cir. 2005). But the parties have pointed to no precedent holding that when public officials seek to use the public's attorneys to assign business to their own friends or family, unbeknownst to the public, such actions are

Even if an attorney within the Mississippi Attorney General's Office who was not involved in this alleged scheme had requested confidentiality as to the attorneys whom the Attorney General's Office had directed the firm to employ, and even if the requesting attorney had been acting on behalf of the State when he did so, the Court questions whether selection of counsel is subject to the ethical rules against non-disclosure. In the analogous but narrower context of attorney-client communications, the prevailing rule is that "a client's identity and fee information are not privileged." *Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997) (citing *In re Grand Jury Subpoena Served upon Doe*, 781 F.2d 238, 247-48 (2d Cir. 1986) (*en banc*)); *see also Vingelli v. U.S. Drug Enforcement Agency*, 992 F.2d 449, 452-53 (2d Cir. 1993) (discussing two exceptions not relevant here). Moreover, it is common practice for newly-hired attorneys to disclose to their new employers the clients whom they formerly represented – this prevents conflicts of interest and does not otherwise implicate ethical concerns. The default rule is that disclosure of the fact of representation is not an ethical breach. *See Barkley v. Olympia Mortg. Co.*, No. 04-CV-875(RJD)(KAM), 2007 WL 656250, at *14 (E.D.N.Y. Feb. 27, 2007) (declining to extend the ethical rule against disclosure of communications to "the fact of representation"). The parties have pointed to no cases in which disclosure of a client's preference for a specific attorney constituted a confidential client communication within the meaning of Rule 1.6, and the Court is aware of none.[16] This does not conclusively establish that a client's choice of a counsel (accompanied by an explicit, underhanded reason) could never be

---

being taken on behalf of the public such that ethical duties owed to the client would extend to such a self-dealing official.

[16]    If a General Counsel, happy with the work of a particular associate at an outside law firm, asks a partner at the firm to use that associate for future matters, and six months later the associate applies for a judicial clerkship, the partner would typically not be subject to ethical reproach for mentioning the client's specific request for the associate's services in her letter of recommendation.

subject to the duty of confidentiality – but the parties have not shown any case analogous to this one in which it was.[17]

In advocating that Bernstein's Complaint is an unethical disclosure of client information, Defendants point to a number of opinions that are not on point. First, they identify several cases in which an attorney's decision to sue his client – even when donning the "whistleblower" hat – has been squarely held to violate the ethical canons. *See United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, 734 F.3d 154, 163 (2d Cir. 2013) (a former general counsel who opined that the company's pricing model was unlawful and was thereafter marginalized at the company could not sue his client in a *qui tam* action based on the alleged illegality of the pricing model); *Hall*, 453 F.2d at 1376 (a corporation's attorney acted unethically when, upon learning of the corporation's misconduct, he purchased a share of stock in order to pursue a shareholder derivative lawsuit); *Wise*, 282 A.D.2d at 335 (a former in-house attorney could not rely on his former client's confidential corporate tax strategies in suing his former client); *see also* N.Y. Cnty. Lawyers' Assocs. ("NYCLA") Comm. on Prof'l Ethics, Op. 746 (2013) at 9 (an attorney's "disclosure of confidential information in order to collect a whistleblower bounty is unlikely, in most instances, to be ethically justifiable"); *Eckhaus v. Alfa-Laval, Inc.*, 764 F. Supp. 34, 37-38 (S.D.N.Y. 1991) (a former general counsel could not disclose confidential information in a defamation suit against his former client). All of the cases on which Defendants rely involve an attorney "turning on" his former client, not revealing untoward information regarding a current or former client's attorney. Moreover, none of the cases addresses whether the information disclosed was in fact confidential; they largely address the

---

[17] The parties appear to be correct that none of Rule 1.6(b)'s exceptions to the prohibition on disclosure of confidential communications applies. Specifically, Bernstein's disclosure exceeds what he could "reasonably believe[] necessary to prevent the client from committing a crime." N.Y. Rules of Prof'l Conduct 1.6(b)(2). *See United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, 734 F.3d 154, 164 (2d Cir. 2013).

inapplicability of the exceptions to Rule 1.6(a). In short, the cases do not support Defendants' argument that Bernstein's Complaint contains confidential client information.

The parties also point to a recent New York State Bar Association ("NYSBA") Committee on Professional Ethics opinion in which the Committee described the ethical obligations of a divorce lawyer who wanted to write a work of fiction cobbling together stories from his practice (and some from his imagination). NYSBA Comm. on Prof'l Ethics, Op. 1026 (2014) ¶ 4. The Committee determined that the attorney would have to be extremely cautious, as his clients' information could be ascertained pursuant to a mosaic theory, whereby stray stories that in isolation were acceptable could, in combination with other stories or identifying characteristics, permit a reader to ascertain a client's identity. *Id.* ¶¶ 14-16. That opinion reaffirms the basic rule that disclosure of seemingly innocuous client information can, in context, reveal confidential information in violation of Rules 1.6 and 1.9. But it does not address whether a lawyer may release information whose disclosure could serve the lawyer's former client while embarrassing the former client's attorney.

Defendants also purport to identify in the Complaint confidential communications relating to the Lead Plaintiff, who did not direct the firm to use any particular lawyer. Def. Mem. at 9. Their logic is unpersuasive – they assert, *inter alia*, that his confidential information would be implicated because "the counsel [he] chose to represent him . . . unlawfully engaged unqualified Mississippi lawyers." *Id.* But there is no suggestion in the Complaint that the Lead Plaintiff knew of the scheme involving MPERS cases. Moreover, alleging that the Lead Plaintiff chose to remain with a firm that is, unbeknownst to him, allegedly obtaining other business by paying kickbacks does not suggest that the Lead Plaintiff has bad judgment or bad character. The Complaint does not allege that Bernstein Litowitz is a bad law firm or that it wore its

corruption on its sleeve; the worst that could be said for the Lead Plaintiff is that, like Bernstein, he had bad luck in choosing law firms. That is not a confidential fact.[18]

Public access to the Complaint does not implicate a "value that plausibly might be construed as being 'higher' than the First Amendment values at stake." *Erie Cnty.*, 763 F.3d at 243-44.[19] Accordingly, the Complaint and docket sheet should be unsealed.

## V.      Balancing under the Common Law Right of Access

Even if the First Amendment presumption of access did not attach to the Complaint, the common law presumption of access to judicial documents would require that it be publicly filed.

### A. There Is a Considerable but Not Overwhelming Presumption of Access

"[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Amodeo II*, 71 F.3d at 1049. It is in this determination that the parties' arguments about the limited use to which the Complaint was put come into play. "[W]here documents are used to determine litigants' substantive legal rights, a strong presumption of access attaches." *Lugosch*, 435 F.3d at 121 (citing *Amodeo II*, 71 F.3d at

---

[18]     The Lead Plaintiff has declared that he "do[es] not want anything [he] said in confidence to any of [his] lawyers to be used" in this case and that he "want[s] all of [his] confidential information to remain confidential." Solomon Decl. Ex. H ¶ 7. None of his confidential information or communications is revealed in the Complaint.

[19]     If public access to some, but not all, of the information in the Complaint would implicate the higher values that could trump the presumption of access that attaches to it, redactions would be appropriate. *See, e.g., Erie Cnty.*, 763 F.3d at 244 n.8; *Amodeo I*, 44 F.3d at 147; *IDT Corp.*, 709 F.3d at 1224 (remanding for the district court to conduct a line-by-line analysis of what redaction is appropriate). The Court has reviewed the Defendants' proposed redacted complaint and finds that none of the eleven categories of information proposed by the Defendants constitute confidential attorney-client communications. Even were the Court to believe that some information in the Complaint was confidential (which it does not for the reasons stated), much of the information redacted by Defendants would not be considered by even the most sensitive person as confidential (*e.g.*, the fact that Bernstein alleges that the firm was engaged in a generic, unspecified "kickback scheme" does not implicate client confidences).

The Court is also aware of the likelihood that some information containing confidential or privileged information – for example, the contents of the allegedly-useless memoranda prepared by the Mississippi attorney – might be at issue later in this litigation; the decision that the Complaint is subject to disclosure has no bearing on whether the public's right of access will extend to any such document.

1049). When a court evaluates submissions and renders a decision that does not meaningfully affect the parties' substantive rights – for example, by denying a motion for summary judgment – "the public interest in access 'is not as pressing.'" *Amodeo II*, 71 F.3d at 1049 (quoting *Reports Comm.*, 773 F.2d at 1342 n.3 (Wright, J., concurring in part and dissenting in part)). Such documents fall into "the middle of the continuum . . . [thus] the weight to be accorded to the presumption of access must be determined by the exercise of judgment. . . . Where such documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal." *Id.* at 1349-50. Finally, when a document plays "only a negligible role in the performance of Article III duties, the weight of the presumption is low and amounts to little more than a prediction of public access." *Id.* at 1350.

The Complaint falls towards the high end of this "continuum," though it is not at the very top. The Court did not rely on the Complaint or adjudge whether it states a claim or whether there is a genuine dispute of material fact because the parties conditionally settled the dispute shortly after the Complaint was filed.[20] But neither is this a document "'that c[a]me within [the] court's purview solely to [e]nsure [its] irrelevance.'" *Lugosch*, 435 F.3d at 119 (quoting *Amodeo II*, 71 F.3d at 1049). The Court dedicates time to evaluating all complaints that come into chambers, sometimes acting *sua sponte* to order parties to show cause why the case should not be dismissed, *see, e.g., Lazar v. Bliss World*, No. 14-CV-8259(VEC), Dkt. 16 (S.D.N.Y.), or transferred to another district, *see, e.g., Alexander v. Chain Electric Co.*, No. 14-CV-6313(VEC), Dkt. 5 (S.D.N.Y.), and sometimes *sua sponte* dismissing parties, *see, e.g., Greene v. City of New*

---

[20]     Because the parties' agreement contains a provision unravelling the agreement if the Complaint becomes public, the Court anticipates that it will, eventually, be called upon to decide all of those issues.

*York*, No. 14-CV-3858(VEC), Dkt. 6 (S.D.N.Y.), or transferring the case elsewhere within the Southern District, *see, e.g., AIG Prop. Cas. Co. v. Tyco Fire Prods., L.P.*, No. 14-CV-1629(NSR)(LMS), Dkt. 6 (S.D.N.Y.). Many such orders are issued less than two weeks after the complaint is transmitted to the Court. When the Court does not take one of these actions, it is because of a concerted and reasoned decision.[21]

Prior to receiving the parties' submissions in this case, the Court reviewed the Complaint and determined not to take any action until receiving a submission in support of sealing the action within the two-week timeframe provided by Judge Castel's Order. "[E]ven the District Court's inaction is subject to public accountability." *Erie Cnty.*, 763 F.3d at 240. To understand and evaluate the Court's decision not to take any of the above actions on the Complaint and to evaluate Judge Castel's decision to allow the case to be commenced under seal for a very limited period of time, the public would need to be aware of the content of the Complaint. The Complaint, a "document[] [that is] usually filed with the court and [is] generally available," *Amodeo II*, 71 F.3d at 1050, falls closer to the top of the spectrum than it does to the bottom – but it still falls somewhere between the two extremes.

Moreover, there is considerable public interest in disclosure of this case. The Complaint intimates that the Defendants regularly engage in a kickback scheme with the Mississippi Attorney General's Office, a public entity whose constituents might otherwise be in the dark about the arrangement. The Complaint alleges that the law firm representing a State entity engaged in wrongdoing during the course of their representation, at the behest of State officials themselves, and then, when the scheme was threatened with disclosure, the law firm secretly

---

[21] In other cases, the court may not exercise its judgment in evaluating a complaint prior to adversarial action; it is possible that complaints in such cases should enjoy a weaker presumption of public access. *See Bergen Brunswig*, 1998 WL 113976, at *3; *see also IDT Corp.*, 709 F.3d at 1224 ("The complaint in this case 'played only a negligible role in the performance of Article III duties.'") (quoting *Amodeo II*, 71 F.3d at 1050) (alteration omitted).

settled the case. *Cf. Erie Cnty.*, 763 F.3d at 241 (noting that "every aspect of this litigation is public"); *Lugosch*, 435 F.3d at 123 n.5 (noting that the district court's assessment of the public interest in the judicial document "ignore[d] its broader context, in which the defendants [we]re lobbying the state legislature and the governor to obtain preferred treatment in connection with a business endeavor").[22]

Defendants' argument that this case concerns purely a private dispute between private parties is unpersuasive. Defendants represent that the $225,000 paid to an allegedly unqualified Mississippi attorney for performing a small amount of allegedly irrelevant work did not require disclosure to the court and did not decrease the class action plaintiffs' recovery or the class action defendants' liability.[23] The Court has to wonder, however, whether the judge who authorized the attorneys' fees in that case might have reduced the fee award or more closely scrutinized the application overall had he known that $225,000 was being provided to a firm that did no pertinent work. Even assuming that Defendants are correct that the payment was irrelevant to any pertinent issue in the *Satyam* litigation, the public – including Mississippians who contribute to and whose retirement is paid by MPERS and federal judges who decide whether to designate MPERS as an adequate class representative in securities class action matters, *see, e.g., Public Emps. Ret. Sys. of Miss. v. Millennial Media, Inc.*, No. 14-CV-7923(PAE) (S.D.N.Y.), and whether to name Bernstein Litowitz as lead class counsel – might well want to know that the Attorney General's Office is selecting outside counsel to represent MPERS based on which firms are willing to pay kickbacks to attorneys whose primary

---

[22]    Any consideration of the public interest in disclosure for reasons other than the evaluation of the Court's Article III judgment must be distinct "from the question of motive," *Lugosch*, 435 F.3d at 123 n.5, because what the press or public might "seek to do with the documents has no effect" on whether they should be sealed, *id.* at 123.

[23]    As indicated in Note 4, *supra*, there was no legal requirement that counsel disclose this arrangement to the judge who authorized attorneys' fees.

qualification is alleged to be their personal relationship with members of the Attorney General's Office and that Bernstein Litowitz is going along with the arrangement.

## B. There Are No Compelling Private Interests Favoring Sealing

The private interests favoring secrecy are weak. As discussed in Part IV, *supra*, this case does not implicate the duty to preserve confidential attorney-client communications or other confidential client information. The parties purport to identify some other private interests at issue, but none is compelling.

First, Plaintiff points to the general value of preserving settlements as a "good" militating in favor of sealing. "'[C]ourts are bound to encourage' the settlement of litigation." *Joblove v. Barr Labs (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 202 (2d Cir. 2005) (overruled on other grounds by *F.T.C. v. Actavis, Inc.*, 570 U.S. ---, 133 S. Ct. 2223 (2013)) (quoting *Gambale*, 377 F.3d at 143); *see also State of W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir. 1971) (it is a "policy of the law generally to encourage settlements"). But this does not hold true at all costs. Plaintiffs may not enlist the resources of the United States judiciary to extract settlements from defendants who are faced with the unhappy option of having serious accusations against them made public or acceding to the demands of their adversary, in secret, and then argue that the court must maintain the secret in order to protect the resulting settlement. While potential plaintiffs put potential defendants between that same Scylla and Charybdis regularly in private, once the courts are involved, the public has a right to know to which purposes their clout has been put.

Although the Court is not unsympathetic to the quandary Plaintiff believed he was in while he was still employed by Bernstein Litowitz, his protestations that unsealing the Complaint "could further impede [his] search for employment" do not carry the day. It was the Plaintiff who elected to file the Complaint when he was unable to negotiate an acceptable settlement by

merely threatening to file a lawsuit. He could have just licked his wounds from selecting a third

law firm that engaged in questionable practices and walked away, having done whatever moral

or ethical duty he felt he had by disclosing the scheme to the U.S. Attorney's Office. But he did

not do so. Instead, he filed his Complaint, asserting that it might disclose confidential

information, and then used the threat of the Complaint's becoming unsealed to leverage a tidy

sum of money from the Defendants while remaining anonymous. This sort of extortionate

conduct hiding behind a judicially-provided mask of anonymity is unacceptable.

Pleas of privacy interests for Bernstein Litowitz's clients are equally unavailing.

"'[P]rivacy interests of innocent third parties should weigh heavily in a court's balancing

equation' in determining the public's access to judicial documents." *United States v. Smith*, 985

F. Supp. 2d 506, 524 (S.D.N.Y. 2013) (quoting *Amodeo II*, 71 F.3d at 1050-51) (alteration

omitted). But there is no allegation that the third parties at issue here, Bernstein Litowitz's other

clients, are aware of the information that is subject to disclosure or have any interest at all in the

information. As to MPERS' privacy interests, "[any] expectation of privacy is diminished where

the client is a body such as a labor union or publicly held corporation, *see Joy,* 692 F.2d at 894,

because a substantial number of citizens rely upon the representation but cannot control it."

*Amodeo II*, 71 F.3d at 1052. The same logic holds true when the client is a State – the people of

Mississippi are entitled to information regarding their representation and their interest in

maintaining the privacy of the conversations between their potentially corrupt representatives

and outside counsel is simply not the same as a single person's desire for privacy in his strategic

direction of his counsel.

Finally, the parties assert that they "will suffer reputational harm if the action is

unsealed." Joint Mem. at 11. The Court does not dispute that an "attorney's reputation is her

most valuable possession." *United States v. Llanez-Garcia*, 735 F.3d 483, 485 (6th Cir. 2013).

Of course, attorneys' reputations must be earned and can be easily tarnished by bad conduct. Essentially, the parties argue that the Court should permit the surreptitious filing and dismissal of a Complaint levying serious accusations against attorneys *because* of how important it would be for the Court to know whether the accusations were true. This is unpersuasive. *Cf. In re Payne*, 707 F.3d 195, 207-08 (2d Cir. 2013) (*per curiam*) (holding that a public reprimand was preferable to a private reprimand for attorney misconduct). Courts that rely on attorneys' reputations in making a variety of decisions understand that allegations in a complaint (particularly coming from an unhappy former employee) are just that. If they are not proven, the allegations have no weight as to Bernstein Litowitz, but Bernstein can expect his reputation will be damaged. On the other hand, if the allegations are proven, Bernstein Litowitz can expect that its reputation will be damaged, and Bernstein's reputation will remain intact. Those possible results, however, do not distinguish this case from much other publicly-filed litigation that occurs every day in this and every other court in the country.

## C. The Judicial Documents Should Be Unsealed

The parties' "application to seal these proceedings in their entirety . . . is a request for extraordinary relief." *Doe v. Greiner*, 662 F. Supp. 2d 355, 359-60 (S.D.N.Y. 2009). In some exceptional cases the courts will entertain such an application and seal the entire case. But this is not such an "exceptional" case. Bernstein does not reveal or rely upon any confidential client information in alleging wrongdoing by his former law firm, and his former firm's clients, MPERS and the people of Mississippi, are part of the "public" that the parties seek to *exclude* from the conversation about what was being done in their name. *Cf. Amodeo II*, 71 F.3d at 1052. Both parties would have been better served by a private settlement. But for reasons that only the parties can know, they could not reach a mutually acceptable resolution of their dispute until Bernstein enlisted the assistance of this Court by filing his Complaint. When that happened,

Bernstein gained the benefit of a heavy cudgel but also triggered the people's "right to know who is using their courts.'" *Sealed Plaintiff*, 537 F.3d at 189 (quoting *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997)). This vaunted right – which is neither at its zenith nor its lowest ebb in the context of a case that was settled within days of being commenced – outweighs the parties' interests in avoiding the reputational risks that might result from unsealing the Complaint.[24]

Bernstein filed this lawsuit, bringing the Court's attention to very serious allegations regarding improprieties by a national law firm and representatives of the people of the State of Mississippi. He used the threat of the Complaint's imminent unsealing to extract a settlement where earlier, less-pressured negotiations had failed. Now he and Defendants contend that the conduct described in the Complaint should never see the light of day. But "[s]unlight is said to be the best of disinfectants." LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY 92 (1913). The First Amendment and common law rights of access to judicial documents outweigh the parties' interests in preserving the confidentiality of the Complaint; accordingly, the docket sheet and Complaint should both be publicly filed.

---

[24] The parties' concerns about the cost of additional litigation are entirely unpersuasive. They have settled this dispute once; it they want to avoid the costs of the litigation they can again settle the dispute.

## CONCLUSION

For the foregoing reasons, the parties' request to continue the sealing order is DENIED.

The Clerk of the Court is directed to unseal this case 30 days from the date that this Opinion

issues, except that the case should remain sealed if either party timely files a Notice of Appeal.

The Clerk of the Court is directed to terminate any pending motions.


**SO ORDERED.**


**Date:  January 12, 2015**
       **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**